#0743

**ORIGINAL**

FILED

OCT 29 2010

U.S. COURT OF
FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
**Bid Protest**

| | |
|---|---|
| GOOGLE, INC.<br>1600 Amphitheatre Parkway<br>Mountain View, CA 94043,<br><br>and<br><br>ONIX NETWORKING CORPORATION<br>26931 Detroit Road<br>Westlake, OH 44145,<br><br>　　　　　　　　**Plaintiffs,**<br><br>　　**v.**<br><br>THE UNITED STATES,<br><br>　　　　　　　　**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)　No.　**10-743 C**<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT**

Plaintiffs Google, Inc. ("Google") and Onix Networking Corporation ("Onix"), by and

through their undersigned Attorney of Record, upon personal knowledge as to themselves, their

own acts, and the contents of the documents referred to herein, and upon information and

belief as to all other matters, hereby bring this bid protest action against Defendant, The

United States of America, and for their Complaint alleges as follows:

**NATURE OF THE ACTION**

1.　　This action protests the terms of U.S. Department of the Interior ("DOI")

Request for Quotation No. 503786 (the "RFQ") for hosted email and collaboration services and

DOI's supporting "Limited Source Justification," and seeks preliminary and permanent injunctions against the DOI proceeding with the RFQ, or any related procurement, solicitation or task order, without first complying with applicable statutory and regulatory requirements, including but not limited to conducting a competition in accordance with applicable law and regulations to select a hosted email and collaboration solution that best satisfies DOI's minimum needs.

**JURISDICTION**

2.      This Court has jurisdiction over the subject matter of this Complaint pursuant to the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, §12(a), (b), 110 Stat. 3870 (Jan. 3, 1996), codified at 28 U.S.C. § 1491(b)(1).

**THE PARTIES**

3.      Plaintiff Google is a corporation organized and doing business under the laws of the State of Delaware with its principal place of business in Mountain View, California.  Google is the developer and owner of computer software products and solutions, including its Google Apps Premier and Google Apps for Government messaging solutions, and Google licenses its products and solutions to customers either through direct agreements or Google's licensed resellers.

4.      Plaintiff Onix is a corporation organized and doing business under the laws of the State of Ohio with its principal place of business in Westlake, Ohio.  Onix is a licensed reseller of Google products and solutions through its GSA Schedule 70 contract.

5.      Defendant, the United States of America, for all purposes relevant hereto, acted by and through the Department of the Interior ("DOI"), an agency of the federal government.

## **FACTUAL BACKGROUND**

Overview

6.      Because the DOI's bureaus and offices were using many different messaging products, the DOI determined that it would acquire a single hosted email and collaboration services solution ("messaging solution" or "messaging requirement(s)") to support its approximately 88,000 users throughout the agency.  Before DOI issued the RFQ, Google representatives made numerous attempts to engage DOI in substantive discussions regarding the technical and cost-saving benefits of the Google Apps solution for DOI's messaging requirements.  Google's objective was to have the opportunity to compete for DOI's messaging requirements.  Notwithstanding Google's efforts and DOI's assurances to Google representatives that DOI would conduct a full and open competition for its messaging requirements, the RFQ specified that only the Microsoft Business Productivity Online Suite-Federal ("BPOS-Federal") could be proposed.  DOI's restrictive specification was based upon a "Limited Source Justification" executed by DOI's Director, Office of Acquisition and Property Management, on August 30, 2010.  Plaintiffs protest DOI's specification of the Microsoft BPOS-Federal solution on the grounds that such specification is unduly restrictive of competition in violation of the Competition in Contracting Act, 41 U.S.C. § 253a(a)(1)(A), and the DOI's "Limited Source Justification" constitutes a sole-source procurement that is arbitrary and capricious, an abuse of discretion, and otherwise contrary to law.

Discussions Prior to DOI's Issuance of the RFQ

7.      In June 2009, Google representatives met with the DOI Chief Technology Officer ("CTO"), who outlined the general functional requirements that DOI had defined to meet its need for an improved e-mail, calendaring and collaboration system.  Google confirmed that all outlined needs could be met with its Google Apps product, and requested an opportunity to meet

again with DOI to further discuss DOI's needs in greater detail and to provide DOI with a fuller understanding of the technical and security aspects of the Google Apps solution.  No meetings on this topic were held between Google and DOI until February 2010, when DOI representatives accepted a Google request for an executive introductory meeting.  The agenda included executive introductions, an update on the Federal Information Security Act ("FISMA") certification status of Google's Messaging solution, Google Apps, for federal government use, and Google's request to meet further for more detailed discussions.

8.     Despite repeated requests and offers from Google for such detailed discussions, the next follow-up from DOI was acceptance of an invitation to a public Google session in April 2010 where Google provided information about its enterprise computing vision, why large organizations have selected Google's technology and the benefits they have experienced, and how to begin a cloud computing initiative at a federal agency.  The public session was attended by then-U.S. Fisheries and Wildlife Service Chief Information Officer ("CIO"), Mr. Bernard Mazer (who subsequently became the DOI CIO), and the DOI CTO, Mr. William Corrington, who informed Google that a "path forward had already been chosen" for the DOI Messaging solution and there would be no opportunity for Google to compete because its product was not compliant with DOI's security requirements.  Despite Google's many requests for such information, DOI declined to define its security requirements or to meet with Google to conduct more detailed discussions about Google Apps, including a full review of Google's security documentation.

9.     Google then contacted the DOI's National Business Center's Chief Contracting Officer, Ms. Debra Glass, by sending her a formal letter of interest on May 17, 2010.  That letter expressed Google's keen interest in competing for DOI's Messaging solution, and outlined the

technological and financial advantages of the Google Apps solution. Google also expressed its view that a solicitation with brand-name specific requirements would violate CICA's requirements and would unfairly preclude the offer of Google Apps or any other competitive or innovative software product. *See* Exhibit A attached hereto.

10.     On May 27, 2010, Ms. Glass sent Google a letter that did not respond to or reference Google's May 17 letter, but instead requested that Google respond to fifteen broadly-worded requirements to "enhance" the DOI's market research. Those questions notably requested a discussion of Google's "[a]bility to meet FISMA security certification requirements" and Google's "[a]bility to provide an underlying infrastructure that is operated solely for DOI." The letter claimed that market research had been conducted by DOI between October 2009 and March 2010.

11.     On June 9, 2010, Google met with DOI representatives in an effort to "enhance" the DOI's market research. Those attending from DOI included: Mr. Andrew Jackson, Deputy Assistant Secretary for Technology, Information and Business Services; Ms. Debra Sonderman, Director, Office of Acquisition and Property Management; Mr. Mazer; and Mr. Corrington. During the meeting, Mr. Jackson stated that DOI had previously standardized on Microsoft solutions, but he claimed DOI was nevertheless committed to conducting a full and open competition. In turn, Google explained how its product would satisfy each of DOI's requirements outlined in the May 27, 2010 letter.

12.     The DOI representatives expressed some concern regarding whether Google could provide an underlying infrastructure that was operated solely for DOI. Google explained that the service for DOI can be isolated to a single domain that is run on a logically separate network. Further, Google explained how its Government-only cloud (reserved for federal, state,

and local governments) would sufficiently address DOI's concerns.  Google also requested that

DOI provide a comprehensive list of objectives and requirements to which Google could

respond; however, DOI never provided such information to Google.

13.     Google followed up this meeting with another letter addressed to Mr. Jackson on

June 17, 2010.  *See* Exhibit B attached hereto.  Google enclosed with the letter written

documentation demonstrating that Google Apps could meet or exceed each of the requirements

described in DOI's May 27, 2010 letter.  Regarding DOI's alleged need for an underlying

infrastructure operated solely for DOI, Google explained that such a "private cloud" was not

required for security certification under FISMA and, similar to GSA's recent solicitation for

"Enterprise E-Mail and Collaboration Services" from a commercial provider of Cloud

Computing services and software, DOI could address its security requirements by requiring that

the contractor "provide security controls that are confirmed to meet the security standards for

Moderate Impact systems as described in NIST SP 800-53 with an accepted Certification and

Accreditation (C&A)." Google also explained that DOI's requirement for a private cloud did not

represent "industry best practice," referencing examples of federal Government entities and

major organizations that use Google Apps.  Finally, since Mr. Jackson had referenced certain

authority from a 2002 Microsoft standardization decision, Google reminded DOI that

standardization decisions are not licenses to circumvent the CICA.

14.     DOI's Mr. Jackson responded to Google's letter by email on June 18, 2010 with a

follow-up question and the following assurances:

> Also, I feel I need to clarify a misconception noted in your letter.
> As I stated last week, DOI has not finalized its procurement
> strategy for the planned cloud messaging solution. We continue to
> evaluate all options in light of our business requirements.

15.     Similarly, Ms. Brigitte Meffert, DOI's Competition Advocate, acknowledged her receipt of a copy of Google's June 17 letter, and she stated on behalf of the Office of Acquisition and Property Management that it was "confident that Google, and all interested parties, will be treated fairly during the process."

16.     On June 23, 2010, Google answered Mr. Jackson's follow-up question, explaining that Google was committed to meeting federal security requirements and would commit to meeting any DOI-defined implementation timelines.  In addition, Google alerted Mr. Jackson to rumors circulating in the industry that DOI had already selected a Microsoft product:

> Finally, we are encouraged by your clarification that the DOI has not finalized its procurement strategy for the planned cloud messaging solution and is continuing to evaluate all options in light of DOI's business requirements. However, we believe you should know that we continue to hear very disconcerting rumors that project deployment activities are already underway to migrate the DOI to a pre-determined messaging solution notwithstanding the lack of any legitimate market research or a "full and open" competition for the DOI's messaging solution.  We would therefore appreciate your confirmation that product selection remains part of DOI's procurement strategy that is currently being defined.

17.     Later that same day, Mr. Jackson responded with another question and further assurances indicating that the "messaging provider" had not been selected despite the rumors heard by Google:

> As for the "disconcerting rumors" you allude to below, I would encourage you to treat rumor and innuendo as just that.  As I am sure you are aware, moving from 13 separate messaging platforms to 1 messaging instance is necessarily a traumatic process for many of our bureaus.  It is one of the challenges of bringing transformative change to a very decentralized department.  We have of course required our bureaus to commence preparations for a migration to our new messaging system, and we believe that these preparation activities will be useful for a successful migration, no matter which messaging provider is ultimately selected.  If you are being told otherwise, I would request that you

recommend that your source contact me directly, so that I can help
correct any misconceptions.

18.     The next day, June 24, Google responded by thanking Mr. Jackson for his
assurances that the procurement strategy and product selection were still being evaluated.  In
doing so, Google reaffirmed its sincere interest in competing for DOI's Messaging requirements.
Google again explained that DOI's security requirements can be stated in terms of FISMA
certifications and controls without requiring a particular infrastructure or computing delivery
model.  Finally, Google notified DOI that its Government-only cloud (federal, state and local)
had been completed ahead of schedule and was available with the capabilities that had been
discussed with DOI.

19.     Mr. Jackson did not respond to Google's June 24 email.  On July 19, Google
attempted to reach Ms. Meffert, the Competition Advocate, by telephone.  Ms. Meffert
responded in an e-mail message that she had no information to provide and that Google should
speak to Ms. Glass, the contracting officer.  Google followed up with Ms. Glass that same day,
re-emphasizing its interest in competing for DOI's messaging solution requirement.  Google was
told that there had been no developments and that the next step would be the issuance of a
solicitation.

20.     Google also sent another e-mail to Mr. Jackson on July 26, 2010.  In this e-mail,
Google notified Mr. Jackson that Google Apps had recently been approved as the first suite of
cloud-computing applications to receive a FISMA certification and accreditation from the
Government.  Additionally, Google continued to express concerns about information it heard
from market research discussions with other Federal agencies.  Specifically, Google alerted Mr.
Jackson that Google had heard that DOI might soon issue to a competitor (meaning Microsoft) a
FISMA certification and accreditation for the competitor's cloud-computing messaging system,

even though DOI had repeatedly refused to review Google's FISMA certification package. After a week had passed with no response, Google sent another e-mail to Mr. Jackson requesting confirmation that DOI was still planning a competitive solicitation, and asking if there were any opportunities for Google to pilot or demonstrate its product offering. Mr. Jackson immediately responded that all correspondence had to be directed to Ms. Glass.

21.     Google responded later that day to Ms. Glass and Mr. Jackson asking to whom discussions should be routed and whether they could discuss any updates, announcements or areas of interest. Mr. Jackson again responded only to state that questions should be routed through Ms. Glass, who did not respond.

22.     On August 2, 2010, Google sent an e-mail to Mr. Corrington, DOI's CTO, to ensure that he had seen the public announcement that Google Apps was the first suite of cloud-computing messaging and collaboration applications to receive FISMA certification and accreditation. Google also requested confirmation from Mr. Corrington as to DOI's plans for a competitive procurement for the selection of a messaging solution. On August 3, Mr. Corrington responded by stating that all correspondence and phone calls should be directed to Ms. Glass.

23.     On August 11, 2010, Google reached out to Mr. Jackson and Ms. Glass one more time to express Google's concerns that recent information it had received conflicted with DOI's past assurances that Google would have an opportunity to compete for DOI's Messaging requirements. Google attached to the e-mail a DOI screen shot, which indicated that a "pilot" project to migrate 5,000 DOI users to the Microsoft platform had been underway for months. Google explained that the "pilot" would severely harm any future competition and requested that DOI conduct a similar test program using the Google Apps solution in order to fairly compare the technologies.

24.     Neither Mr. Jackson, Ms. Glass nor any other DOI official responded to Google's August 11 e-mail.  On September 8, 2010, after intervention by DOI's Office of the Solicitor at the request of Google's counsel, Ms. Glass finally advised Google's counsel that an RFQ had been issued via GSA's e-Buy and that offers were due within days.

The RFQ

25.     The RFQ was posted on e-Buy on August 30, 2010.  The RFQ requested offerors to submit proposals providing hosted e-mail and collaboration services for all DOI bureaus and offices.  The contract is intended to be a single award, firm-fixed-price Blanket Purchase Agreement ("BPA") awarded against a GSA Federal Supply Schedule.  The period of performance will end after five years, unless the maximum dollar threshold of $59.3 million is reached first.  The RFQ required offerors to submit three proposal volumes:  Volume 1 – Management/Technical Approach; Volume 2 – Past Performance; and Volume 3 – Price/Business.  The RFQ's instructions advised prospective offerors to submit questions or comments by noon on September 3, and that the initial due date for proposal submission was September 10, 2010.

26.     The offerors' Management/Technical Approach proposal, limited to 17 pages, was required to "reflect a thorough understanding of the requirements and a detailed description of techniques, procedures and tools used for achieving the objectives of the Statement of Work (SOW)."  The Past Performance proposal, limited to three pages, could include references from the Federal government, state or local governments, quasi-government organizations within the USA, educational entities, or commercial organizations within the USA within the past three years.  Those references were required to demonstrate how successful the offerors "have been in

the past to complete all aspects of the SOW." The offerors' Price/Business proposals were required to include a completed pricing table and any associated assumptions.

27.     Section L.9 of the RFQ stated that the Government would make an award to the contractor that "represents the best value, price and other factors considered." The RFQ advised that "[t]echnical evaluation factors [were] more important than price; however, between quotes that are evaluated as technically equal in quality, price will become a major consideration in selecting the successful Offeror." Section L.8 of the RFQ explained that the Management/ Technical Approach would be evaluated based on 1) evidence of infrastructure and specific methods for support; 2) the offerors' described ability to anticipate problems; and 3) the offerors' described standard reports. Past Performance proposals would be evaluated based on evidence of success supplying similar services and evidence of the ability to advocate for client issues with a manufacturer. The RFQ did not describe how the Price/Business proposal would be evaluated or what the source selection team might consider to evaluate price reasonableness. Rather, the RFQ stated that "[w]hen combined, the non-price factors are more important than price."

28.     The SOW set forth the technical requirements applicable to the messaging solution. The Background section contained a two-page discussion regarding cloud computing and described a "risk assessment" conducted by DOI resulting in DOI's conclusion that it required the following attributes of a cloud computing deployment:

- Compliance with security requirements defined by the Federal Information Security Management Act (FISMA) along with enhanced DOI-specific security requirements
- Dedicated data storage infrastructure (both physically and logically) to DOI or to DOI and other Federal government customers only
- Dedicated computing infrastructure (both physically and logically) to DOI or to DOI and other Federal government customers only

- Implementation of at least two data centers located within the continental United States.
- Enterprise e-mail and collaboration services provided by an external vendor as a standardized service offering

29.     The stated requirement for an infrastructure that is dedicated to the DOI and other Federal government customers only was not explained in the SOW. However, the SOW stated that "extensive market research" led to a determination that the Microsoft BPOS Federal solution was "the DOI's product selection of choice." Further, the SOW explained that a 2002 Microsoft standardization decision was reviewed and re-affirmed in an updated standardization memo in July 2010.

30.     The requirements outlined by the SOW reflect an emphasis on compliance with FISMA security controls. Section 2.1, "Information Security," provided as follows:

> Underlying all of the requirements described herein is the need for DOI to meet the obligation to secure the messaging and collaboration system in compliance with the Federal Information Systems Management Act (FISMA) …

Similarly, Section 10.5, "Security Requirements," stated that the DOI's risk assessment resulted in a determination the DOI needed to implement a system that was FISMA-compliant, and Section 10.5.3 required that "[a]t all times, the Contractor shall comply and the Contractor shall cause Microsoft to agree to comply with the [FISMA]." As the SOW acknowledged, the Microsoft BPOS-Federal product is not yet FISMA-certified. As such, this essential element would be pursued and developed during contract performance. A discussion on how the Contractor, Microsoft, and DOI can, at some unknown point in the future, establish the technological controls to achieve this critical certification follows in Sections 10.5.3 and 10.5.4.

31.     Significantly, the SOW requirements and even certain terminology were closely aligned with Microsoft's product literature for its Exchange Online, SharePoint Online, and

Office Communications Online applications.  This was because DOI had defined its needs and requirements around the Microsoft products.

DOI's Limited Source Justification

32.     The background section of the RFQ's SOW, described above, was based upon a "Limited Source Justification" ("Justification") executed by the Director of DOI's Office of Acquisition and Property Management, on August 30, 2010.  The Justification stated that two features of the Microsoft BPOS-Federal suite (consisting of hosting services, Exchange Online, SharePoint Online, and Office Communications Online) are critical to DOI's successful implementation of a transition from a disparate and disjointed email message system to a consolidated and secure system, and form the basis for the Justification.  Those features are a unified and consolidated email system and enhanced security.

33.     The Justification described DOI's current email implementation, which consists of 13 systems owned and operated by each bureau and office supporting approximately 85,000 users, and DOI's failed efforts during 2002-2006 to obtain an e-mail system custom-built by a systems integrator to DOI's specifications.  After that project was cancelled in 2006, DOI began researching other options for a centralized e-mail system.  The Justification then described the security challenges associated with implementing a department-wide e-mail solution, as follows:

> Underlying the requirement for a functioning email system is the
> need for the Department to universally meet the obligation of a
> secure enterprise messaging, collaboration and storage system.  In
> order to maintain a robust approach to achieving its mission, the
> Department requires the ability to seamlessly share, store and
> integrate information in a highly secure environment.  This
> requirement is based not only on Federal security requirements; it
> is also based on the diverse functions of DOI.  In particular, the
> Department has the primary fiduciary duty to manage tribal trust
> funds and Individual Indian Money (IIM) accounts, as well as the
> resources that generate income for those accounts.  The
> Department also has a fiduciary duty to protect procurement and

> business sensitive communications for itself, its collaborators and
> its customers.  Furthermore, the Department has law enforcement
> and investigative authorities, resource protection and management
> authorities (especially with regard to culturally sensitive areas);
> and lab and research authorities which also subject the Department
> to rules and regulations regarding collection, storage and sharing of
> protected information.

34.    Next, under the heading "Identifying Solutions," the Justification stated as

follows:

> The commercial market has developed several solutions that may
> better meet the needs of the federal Government as a whole,
> including cloud computing models.  Given the rapidly changing
> technical environment, the Department needed to assess what
> model would best meet its current needs.  To that end, the
> Department determined that a dedicated private cloud service
> model, combined with robust messaging and collaboration tools
> would best meet its current needs.

35.    Section 3 of the Justification described the specific "supplies or services required

to meet the agency's needs."  The first requirement that "must be met by a messaging and

collaboration system in order to support the DOI mission" was identified as "Core

Functionality," described as follows:

> In a standardization memo issued in September 2002, DOI
> established Microsoft Office suite as a departmental standard.  In
> July 2010, the standardization decision was reviewed and re-
> affirmed through the issuance of an updated standardization memo.
> The Microsoft Office suite includes the Microsoft Outlook e-mail
> client, which provides a full-featured e-mail system that also
> provides calendaring and scheduling functionality.

36.    Seven additional requirements were described in Section 3, including

"Information Security" headlined by "the need for DOI to meet the obligation to secure the

messaging and collaboration system in compliance with the Federal Information Systems

Management Act (FISMA) and other Federal security requirements."  Section 3 concluded by

stating that the estimated contract award amount "will be $59 million over the expected five (5)

year contract life cycle."

37.    Section 4 of the Justification described DOI's rationale, under FAR 8.405-6(a)(2),

for "the acquisition of an item peculiar to one manufacturer." According to the Justification,

DOI utilized the "accepted methodology" set out by the Cloud Security Alliance ("CSA") and

the National Institute of Standards and Technology ("NIST") to determine "its risk tolerance for

implementing current solutions in light of its goals, objectives and mission." According to the

Justification:

> Specifically, DOI followed an assessment process recommended
> by the CSA to establish that the following attributes of a cloud
> computing deployment meet DOI's requirements for the
> implementation of an enterprise email and collaboration system:
>
> - Collaboration services provided by an external vendor as a
>   standardized service offering
> - Ability to comply with security requirements defined by
>   FISMA
> - A data storage infrastructure that is solely dedicated (both
>   physically and logically to DOI or to DOI and other Federal
>   government customers only
> - A computing infrastructure that is solely dedicated (both
>   physically and logically to DOI or to DOI and other Federal
>   government customers only
> - Implementation at a minimum of two data centers that are
>   located within the continental United States

Significantly, the Justification does not evidence or explain why DOI relaxed its

requirement from an underlying infrastructure that is <u>operated solely for DOI</u>, as

expressed by DOI in its May 27, 2010 letter to Google (*see* Exhibit B attachment

identifying DOI's stated requirements), to an underlying infrastructure that can be

dedicated to DOI and any other Federal government customers.

38.     The Justification stated that DOI had conducted "extensive market research" soliciting product and Federal security compliance information from vendors, trusted third-party research, and other Federal government informational resources.  According to DOI, "[m]ethodology included personal knowledge, contacting knowledgeable individuals in Government and industry, reviewing recent market research results for similar services, and reviewing generally available product literature."  DOI concluded:  "Based on this extensive market research, the Department determined that although many companies can provide messaging services in general, they either cannot provide services that address the complexity of messaging requirements within DOI, or they could not meet the degree of security required by DOI."

39.     The Justification stated the following conclusion:  "Based on the risk assessments and market research conducted, the Department determined that the Microsoft BPOS solution is the only commercial product that satisfies every requirement identified by the Department."

The Microsoft BPOS-Federal Solution

40.     There is very little to no publicly-available information about the Microsoft BPOS-Federal solution other than a Microsoft press release on its website.  The press release states that Microsoft announced on February 24, 2010, at its eighth annual Microsoft U.S. Public Sector CIO Summit, the unveiling of a number of new enhancements and certifications for its BPOS-Dedicated solution and the launch of BPOS-Federal.  The press release further stated that:

> Business Productivity Online Suite Federal is launching today for U.S. federal government agencies, related government contractors and others that require the highest levels of security features and protocols.  The new offering includes all the certifications and security features of the Business Productivity Online Suite and more.  The service is housed on separate, dedicated infrastructure in secured facilities.  Physical access to those systems is limited by biometric access controls to a small number of individuals who, in

compliance with International Traffic in Arms Regulations (ITAR),
must be citizens of the United States who have undergone rigorous
background checks, including fingerprinting.

41.     The BPOS-Federal solution is therefore a new product, and there are no publicly-identified customers who have either purchased or implemented the BPOS-Federal solution.  In OMB's recent report on the State of Public Sector Cloud Computing (available at http://www.cio.gov/pages.cfm/page/State-of-Public-Sector-Cloud-Computing), there are no case studies reported of any customer using the BPOS-Federal product.  Moreover, as of the date of this protest, the BPOS-Federal solution has not been certified according to FISMA standards by any government agency at any risk level.  Notwithstanding these glaring deficiencies, the DOI has concluded that only the BPOS-Federal solution can meet the degree of security required by the DOI.

42.     Additionally, even prior to the completion of DOI's test use of the solution, the DOI designated BPOS-Federal as the official standard for messaging and collaboration services on July 15.  This standardization on BPOS-Federal appears to conflict with the Justification's statement that the determination was made in accordance with 375 DM 12, which is DOI's departmental manual describing its information resources standardization program.  Section 12.3(A) of the manual provides that the primary objective of the Information Resources Standards Program is to "promote compatibility and interoperability to minimize costs for information systems."  The BPOS-Federal solution does not uniquely support compatibility and is more restrictive of interoperability than other options available to DOI.  There are other solutions available in the marketplace which are compatible with the Microsoft products selected as DOI's official standard in 2002 and are substantially less expensive to the customer than BPOS-Federal.

43.     Moreover, based on publicly-available information gleaned from internet searches, Microsoft topped a list of 12 major software providers for the number of security vulnerabilities and software patches needed to plug security holes (23% of "disclosures with no patch") that affect both on-premise and "hybrid" cloud technology.  In contrast, Google was the only provider on the list with 0% "disclosures with no patch."  The likely reason for this difference is that Microsoft BPOS is based on the same Microsoft Exchange and SharePoint servers that are made for an on-premise, legacy model so users inherit the same feature refresh limitations and patch model/security vulnerabilities.  The Google Apps system, on the other hand, was built for the cloud from the ground up, providing continuous access to new features, faster response to security vulnerabilities, and better real-time collaboration.  Only a web browser, rather than client software, is required to use the Google Apps solution.  Apparently, despite its "extensive market research," DOI did not uncover this information about Microsoft's security vulnerabilities.

44.     DOI also was apparently unconcerned about the numerous outages that Microsoft has experienced this year for BPOS-Standard – a January outage lasted nearly four days.  The two most recent outages occurred on August 23 and September 3 and impacted users throughout North America.  *See* http://www.zdnet.com/blog/microsoft/microsoft-bpos-down-for-90-minutes-second-outage-in-a-month/7302.  Given the DOI's requirement, as specified in the SOW, for 99.95% system uptime, Microsoft's outages this year cast doubt on whether the BPOS-Federal solution will satisfy all of DOI's requirements.

Google's GAO Protest

45.     On Friday, September 10, 2010, Google filed a timely protest at the U.S. Government Accountability Office ("GAO") against the RFQ's restrictive requirement that

offerors only propose the Microsoft BPOS-Federal solution and DOI's determination in the "Limited Source Justification" that the BPOS-Federal solution is the only product that can satisfy DOI's minimum needs. Google's protest alleged that DOI's restriction that the messaging solution's data storage and computing infrastructure be physically and logically dedicated only to Federal government customers, which is the primary justification for DOI's selection of the Microsoft BPOS-Federal solution, is not necessary to satisfy DOI's minimum needs. The protest further alleged that Microsoft's BPOS-Federal product did not satisfy the RFQ's restrictive requirement.

46.     On September 30, 2010, DOI filed with the GAO a request for dismissal of Google's protest on the basis that Google, which does not have a GSA Schedule contract, was not an "interested party" as defined in GAO's Bid Protest Regulations, 4 C.F.R. § 21.0(a)(1). Google opposed the dismissal request on October 4, 2010. In addition, Plaintiff Onix filed its own protest on October 4 with the GAO to effectively join Google's protest because of its common interest, via its reseller agreement with Google, in challenging DOI's restrictive requirement and seeking an opportunity to compete for DOI's messaging requirements. Another licensed reseller, Daston Corporation, also filed a similar protest on October 4.

47.     On October 25, 2010, the GAO issued its decision dismissing Google's protest on the ground that Google was not an interested party. On October 26, the GAO dismissed the Onix protest. It appears that the GAO never docketed the Daston protest.

**COUNT I**
**(VIOLATION OF THE COMPETITION IN CONTRACTING ACT AND THE FAR)**

48.     Plaintiffs reallege and incorporate by reference the allegations of Paragraphs 1 through 47 above, as if fully set forth herein.

49.     Defendant's implementation of the RFQ, by imposing the selection of the Microsoft BPOS-Federal solution for DOI's agency-wide messaging requirements based on the "Limited Source Justification," without obtaining any sort of product competition, violates the statutory requirement of 41 U.S.C. § 253(a) to obtain full and open competition through the use of competitive procedures.

50.     Defendant did not comply with FAR 8.405-6 in that DOI's market research, consisting in part of many months of communications with Plaintiff Google, established that another company's product (*i.e.*, Google's Google Apps messaging solution) does meet, or can be modified to meet, DOI's needs.

## COUNT II
## (AGENCY ACTION IN SELECTION OF MESSAGING SOLUTION IS ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION, AND CONTRARY TO LAW)

51.     Plaintiffs reallege and incorporate by reference the allegations of Paragraphs 1 through 50 above, as if fully set forth herein.

52.     DOI's selection of the Microsoft BPOS-Federal messaging solution, as reflected in the "Limited Source Justification" dated August 30, 2010, for implementation throughout the agency is arbitrary, capricious, an abuse of discretion, and contrary to law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter judgment for Plaintiffs on this Complaint for injunctive and declaratory relief prohibiting DOI from proceeding with the RFQ, or any related solicitation, task order or activity (such as DOI's current 5,000-user pilot program) that furthers or facilities the implementation of the Microsoft BPOS-Federal solution at DOI, without first complying with applicable statutory and regulatory requirements, including but not

limited to conducting a competitive procurement in accordance with applicable law and regulations to select a messaging solution that best satisfies DOI's minimum needs.  In addition, Plaintiffs request that this Court afford Plaintiffs such other and further relief as this Court may deem just and proper.

Respectfully submitted,

Timothy Sullivan
1909 K Street, N.W., 6th Floor
Washington, D.C.  20006
(202) 585-6930 (tel.)
(202) 508-1028 (fax)

Attorney of Record  for Plaintiffs Google, Inc.
and Onix Networking Corporation

Of Counsel:

Katherine S. Nucci
Scott F. Lane
Thompson Coburn LLP

Dated:  October 29, 2010

# EXHIBIT A



May 17, 2010


VIA ELECTRONIC MAIL

Ms. Debra Glass
Chief, Acquisition Management Division IV
United States Department of the Interior
Acquisition Services Directorate
381 Elden St., Suite 4000
Herndon, VA 20170

Re:     The U. S. Department of Interior's Pending Messaging Solicitation

Dear Ms. Glass:

Google Inc. ("Google") understands that the Department of Interior ("DOI") is planning to release a solicitation for a department-wide messaging solution (the "Solicitation") with brand-name specific requirements. Google respectfully requests that the Solicitation be revised to allow for the offer of our product, Google Apps, as a potential solution. As discussed more fully below, we believe Google Apps is a technically-superior and cost-effective solution for the DOI's needs. Notwithstanding our firm views on this issue, recent discussions with DOI representatives have indicated that the Solicitation will require using specific Microsoft products. We believe these Microsoft-based requirements would violate the Competition in Contracting Act because they bear no rational relationship to the DOI's needs, are not written to enhance competition or innovation, and unduly restrict competition.

We recognize that the formal Solicitation has not yet been released; however, the impact of this requirement on our ability to compete makes this an immediate concern. Moreover, resolving the concern at this stage could be accomplished easily by ensuring the final Solicitation is released without unjustified brand-name requirements.

## I.     Google Apps Is A Competitive Alternative For The DOI

Google Apps is a proven, enterprise-ready solution that is completely interoperable with Microsoft software at a dramatically lower total cost of ownership. Even though Google Apps is used and trusted by more than two million organizations, the DOI's arbitrary requirement to use only Microsoft-based products would preclude the offer of Google Apps, or any other software product that competes with Microsoft. While we obviously do not know the breadth and scope of the DOI's market research that preceded the drafting of the Solicitation, it would appear that the research did not include an analysis of the most current state-of-the art technology or the features and benefits that Google Apps has to offer.

Ms. Debra Glass
May 10, 2010
Page 2

Market research from even a year or two ago could not have anticipated the technological changes experienced in the messaging services market. For example, within the past year, the White House has launched a cloud-computing initiative to increase innovation and reduce information technology costs.1 The President's FY 2010 Budget specifically identifies cloud computing as a way "…to optimize the Federal data facility environment and create a platform to provide services to a broader audience of customers." Also within the past year, Google Apps has added over 116 new features to help organizations, like the DOI, keep pace with modern web-based messaging and collaboration technology. Market research in this environment should be constantly assessed and updated to ensure the DOI procures innovative technology at competitive prices.

A current analysis of the features and benefits that Google Apps has to offer would show that in addition to e-mail, calendaring and instant messaging, Google Apps offers a suite of collaboration tools (such as integrated voice and video chat, web-based documents, easy website creation, and access-controlled sharing of documents) that makes employees more productive and improves information sharing. And since consumer versions of Google's products are globally tested by millions of users, they are optimized for ease-of-use and to keep training requirements to a minimum. In fact, many business users have used cloud-based computing services, such as Google Apps, the majority of their lives for personal use. A summary of significant benefits provided by Google Apps includes, but is by no means limited to, the following:

- **Dramatically reduced cost**: GSA pricing is less than $50 per user/year. This represents a savings of two-thirds or more based on what most U.S. government agencies pay for email today.
- **Much more storage**: Google Apps has a 25GB inbox, approximately 50 times the size of the average DOI email inbox today.
- **Better Collaboration**: The platform includes, at no extra cost, document, spreadsheet, and presentation tools that provide the capability to collaborate in real time. It also includes instant messaging with voice and video chat, a site creation tool, and video sharing.
- **Green Technology**: Because Google Apps is a cloud-computing solution, agencies are not required to own, maintain, and operate their own servers. This creates a significant savings in electric power. For example, the City of Los Angeles estimates that it will save over $700,000 per year in electric power and cooling costs alone as a result of its adoption of Google Apps.

Google Apps also delivers reliability and security built on Google data centers, reducing infrastructure and maintenance needs while helping agencies establish an effective continuity of operations and disaster recovery plans. The security of Google Apps is underscored by the fact that its FISMA Certification & Accreditation package submitted to the government is at the

---

[1] Microsoft Exchange is not a cloud-computing solution, whereas Google Apps was one of the first cloud-computing products to be made available on www.Apps.gov.

Ms. Debra Glass
May 10, 2010
Page 3

Moderate Impact level which exceeds or equals DOI security requirement. Moreover, Google Apps is currently developing a Government-only cloud environment available only for federal, state, and local U.S. government customers. This Government-only cloud, planned to be operational in time for this procurement, would be hosted completely within the U.S., including the primary and backup sites. Google Apps offers many desirable and beneficial features that we believe have not been considered, and we would be pleased to provide the DOI with a more in-depth description of the product or to provide a presentation of the Google Apps solution to the DOI.

## II.     Google Apps Can Meet Or Exceed The DOI's Needs

Even though Google Apps represents a competitive solution for the DOI's messaging needs, we have been informed that the Solicitation is currently written to exclude our product. DOI representatives have claimed that Google Apps is not an option because documentation from the DHS led, Trusted Internet Connection ("TIC") program allegedly does not allow any solutions based on multi-tenant architecture. There is no factual support for such a blanket assertion and that position is in contrast to the viewpoint of DHS, FedRAMP representatives and the Administration's priorities on the use of cloud computing. Google has requested an opportunity to meet with DOI representatives to explain the benefits of Google Apps and to fully understand the DOI's messaging needs; however, Google was told that the path forward has already been chosen.

Other Federal Agencies have recognized that full and open competition based on a statement of objectives will most effectively enable their best value decision for messaging solutions. NASA recently amended a published RFP for messaging to remove the requirement for a specific named product when they realized there are viable options in the marketplace. Likewise, DHS has postponed an RFP for messaging which contemplated requiring a specific named product when DHS officials realized there are viable options in the marketplace which strongly merit detailed review.

We sincerely appreciate your offer to investigate our concerns. We are very confident in our product, and so our questions are targeted to understand what justification the DOI could provide to exclude our product. Specifically, we would ask: (i) when and how was the market research performed; (ii) whether, how, and to what extent Google Apps was considered; and (iii) what justification exists to exclude compatible products that are equal to or better than the brand-name?

## III.    The Competition In Contracting Act

The Competition in Contracting Act imposes a duty on agencies to solicit proposals "in a manner designed to achieve full and open competition for the procurement." 41 U.S.C. § 253a(a)(1)(A). When fulfilling these requirements, restrictive provisions are only allowed in solicitations "to the extent necessary to satisfy the needs of the agency or as authorized by law."

Ms. Debra Glass
May 10, 2010
Page 4

FAR 11.002(a)(1)(ii). If a requirement is challenged as unduly restrictive of competition, it is the agency's responsibility to establish that the specification is reasonably necessary to meet its minimum needs. Omega World Travel, Inc., B- 258374, Jan. 13, 1995, 95-1 CPD ¶ 20. In summary, solicitation terms must have a rational relationship to an agency's minimum needs, must be written to enhance competition and innovation, and must not be unduly restrictive of competition. CHE Consulting, Inc. v. U.S., 74 Fed.Cl. 742, 747 (Fed. Cl. 2006).

As detailed above, Google Apps represents a state-of-the-art, secure, and cost-effective solution for messaging services that is wholly compatible with Microsoft software. Consequently, the pending Microsoft-based requirements bear no rational relationship to the DOI's needs and unfairly preclude our Google Apps product or any other competitive or innovative software product. Google should be afforded an opportunity to compete on an equal basis. In turn, the DOI will achieve a more robust competition with more innovative solutions.

Google therefore requests that the Solicitation be released without the unjustified Microsoft-based requirements. Additionally, we would suggest that the Solicitation be released initially as a draft to receive current industry feedback on the specific terms. We sincerely hope that this letter convinces the DOI of Google's ability to provide an optimum and cost-effective solution to meet the agency's needs and that the unduly restrictive requirement will be removed prior to the formal Solicitation in order to foster competition and innovation. We are excited about having the opportunity to compete for the DOI's business, and we are confident that our product will be an effective tool to help the DOI do much more for much less.



We greatly appreciate your prompt and careful consideration of this request and, again, we are prepared to meet with you to further discuss this situation at your earliest convenience.

Very truly yours,

Michael Lock
Vice President
Enterprise Sales

# EXHIBIT B



1600 Amphitheatre Parkway
Mountain View, California 94043

Tel: 650.623.4000
Fax: 650.618.1806
www.google.com

June 17, 2010

**VIA ELECTRONIC MAIL**

Honorable J. Andrew Jackson
Deputy Assistant Secretary for Technology, Information and Business Services
U. S. Department of the Interior
Office of the Secretary
Washington, D.C. 20240

Re:   The U. S. Department of Interior's Anticipated Messaging Solution Solicitation

Dear Mr. Jackson:

Google Inc. ("Google") greatly appreciates the time taken by you and your colleagues to meet with our team on June 9, 2010 to discuss the Department of Interior's ("DOI") market research and requirements underlying the DOI's anticipated solicitation for a messaging and collaboration systems solution (the "Solicitation"). During that meeting, Google explained that our product, Google Apps, could meet or exceed all of the agency's needs[1], as they were outlined in the DOI's letter to Google, dated May 27, 2010 (the "DOI letter"). However, considering the complexities of the technology, the time constraints of that meeting, and the ideas expressed by some DOI representatives, we believe the DOI's market research remains incomplete.

Specifically, during the meeting, DOI representatives expressed a preference that the messaging system's physical computing infrastructure be operated solely for the DOI (as a "private cloud") even though this preference was not stated in the DOI letter, would dramatically decrease competition and will result in increased costs to the DOI. It became apparent to Google that the DOI intends to convert this preference into an absolute requirement in the impending Solicitation. Since Google intends to offer messaging services hosted in a Government-only cloud, rather than a private cloud, such a broad restriction would arbitrarily exclude Google from the competition.

If the DOI were to perform comprehensive market research to determine what is available in today's marketplace, we firmly believe the DOI will find that a private cloud

---

[1]  We have enclosed a brief summary of how Google Apps meets each of the DOI's stated requirements.



1600 Amphitheatre Parkway
Mountain View, California 94043

Tel: 650.623.4000
Fax: 650.618.1806
www.google.com

is not necessary to satisfy its needs, as constrained by the Competition in Contracting Act
("CICA"). Indeed, if security is the DOI's true concern, that concern can be fully
addressed by identifying the DOI's security requirements in terms of specific
certifications and controls, such as those defined under the Federal Information Security
Management Act ("FISMA").[2]

## I.   A Private Cloud Is Not Necessary To Satisfy The DOI's Needs

The CICA imposes a duty on federal agencies to solicit proposals "in a manner
designed to achieve full and open competition for the procurement." 41 U.S.C. §
253a(a)(1)(A). When fulfilling these requirements, restrictive provisions are allowed in
solicitations only "to the extent necessary to satisfy the needs of the agency or as
authorized by law." FAR 11.002(a)(1)(ii). The GAO consistently sustains solicitation
protests where restrictive provisions exceed an agency's minimum needs. For example,
in *The Kohler Company*, B-257162, Sept. 2, 1994, 94-2 CPD ¶ 88, the agency's
solicitation for generators restricted offerors to proposing only 4-cycle engines, as
opposed to 2-cycle engines. The agency claimed the restrictive provision was justified by
technical literature describing 4-cycle engines as "state of the art," because they
supposedly generated less pollution, were more fuel efficient, were quieter, and were
easier to maintain. The protestor presented opposing technical literature stating that the
two types of engines were equal. The GAO sustained the protest, holding that:

> The competing positions reflected in the technical literature
> relied upon by all of the parties serve to illustrate that, as in
> the 1970s, the "state of the art" in diesel engine design is
> still a matter of controversy in the industry…We need not
> resolve this debate, however, since if environmental, noise,
> fuel consumption, and reliability issues are concerns of
> [agency], specifications for such parameters can easily be
> drafted without requiring a particular engine design.

Similarly, in *Data-Team, Inc.*, B-233676, April 5, 1989, 89-1 CPD ¶ 355, the
GAO sustained a protest where the agency had drafted its requirements based on
preconceived notions. In that case, a solicitation requirement that copiers use dry toner
was challenged as unduly restrictive of competition. The agency asserted that the
requirement was related to its need to relocate the copiers quickly without leakage of the
toner. The agency had decided to exclude liquid toner machines based on its prior
experience with out-dated machines that had leaked. However, the protester was able to

---

[2] For example, the General Services Administration ("GSA") just issued Solicitation No. OCIO-14558 for
Enterprise E-Mail and Collaboration Services for purposes of acquiring "e-mail and collaboration services
as Software as a Service (SaaS) from a commercial provider of Cloud Computing services and software.
The GSA's Statement of Objectives requires that the contractor "provide security controls that are
confirmed to meet the security standards for Moderate Impact systems as described in NIST SP 800-53
with an accepted Certification and Accreditation (C&A)." If the DOI stated its requirements using similar
language, our concerns would be alleviated and the agency and taxpayers would benefit from a much more
robust competition.



1600 Amphitheatre Parkway
Mountain View, California 94043

Tel: 650.623.4000
Fax: 650.618.1806
www.google.com

show that justification to be unreasonable because copier technology had advanced to a state where even liquid toner machines could be relocated quickly without leakage or spillage of the toner.  The GAO recommended that the solicitation be amended to address the need for copiers that could be quickly and easily moved, without eliminating all liquid toner copiers from the competition.

Google understands that, similar to the engine design debate addressed in *The Kohler Company* decision, there may be competing technical literature related to various computing infrastructures.[3]  That debate cannot be resolved unilaterally by the DOI without a competition, certainly not when real technical parameters could easily be drafted (alà the recent GSA solicitation) without limiting competition to a specific infrastructure for the messaging solution.  Further, even if the DOI has experience with various messaging infrastructures, the technology is rapidly advancing, such that a broad exclusion based on preconceived notions, as in *Data-Team, Inc.*, would be arbitrary.  If the DOI is concerned about the security of the messaging system, the DOI should draft technical requirements based on FISMA certifications and controls -- like the security requirements specified in the GSA solicitation -- without requiring a particular infrastructure or computing delivery model.[4]  This will not only enable a more robust competition, but it will help to ensure that the DOI's true needs are satisfied through the Solicitation's specifications.[5]

## II.    Standardization Decisions Are Not Exempt From CICA

Despite the apparent gaps in the DOI's market research, we understand that the DOI had already defined a procurement strategy and requested bureau migration plans prior to the June 9 meeting with Google.  We understand that this previously developed procurement strategy is somehow based upon a purported "Standardization Authority" related to a 2002 DOI memorandum.  We are very troubled by the contrast between the DOI's public statements promising full and open competition and what we understand is actually happening behind the scenes.

---

[3] The current version of the National Institute of Standards and Technology's ('NIST") definition of "cloud computing," version 15, provides that:  "Cloud computing is still an evolving paradigm. Its definitions, use cases, underlying technologies, issues, risks, and benefits will be refined in a spirited debate by the public and private sectors. These definitions, attributes, and characteristics will evolve and change over time." Notably, although the NIST definitional documents elaborate on the different types of cloud models, no specific cloud model is listed as being more secure than any other. http://csrc.nist.gov/groups/SNS/cloud-computing/cloud-def-v15.doc

[4] The Google and Microsoft cloud solutions are both being certified by FISMA at the "moderate" level -- demonstrating equivalency in security as judged by the NIST 800-53 security controls and the NIST 800-37 risk management framework.

[5] Based on discussions at our June 9, 2010 meeting, we presume security is the concern underlying the requirement for a private cloud, but the concept of drafting technical requirements that express underlying needs is applicable to any other concerns the DOI may have as bases for justifying its perceived need for a private cloud.

1600 Amphitheatre Parkway
Mountain View, California 94043



Tel: 650.623.4000
Fax: 650.618.1806
www.google.com

Standardization decisions do not exempt procurements from the CICA's competition mandate. For example, in *Savantage Financial Services, Inc. v. United States*, 81 Fed. Cl. 300 (2008), the Department of Homeland Security ("DHS") attempted to standardize its financial management system software by expanding its existing contracts with two specific vendors rather than holding a full and open competition. The Court of Federal Claims sustained the ensuing protest by Savantage, whose financial management software was being used by multiple DHS components, on the basis that the DHS never conducted a competitive procurement to support its standardization decision and it could not otherwise justify the sole-source award under CICA.

Here, even assuming *arguendo* that the DOI conducted a competition or valid sole-source justification that pre-dated the 2002 memorandum, that eight-year old memorandum has no logical nexus to the current market for messaging services. The field of competition, the technology, the product packages, the security, the interoperability, and costs have all drastically changed in the past eight years. It would be unreasonable to rely upon that memorandum to justify a sole-source award today. Moreover, we again point out that previous investments in Microsoft products would not be lost because Google Apps is interoperable with Microsoft software.

### III.   A Private Cloud Does Not Necessarily Reflect "Industry Best Practice"

During the June 9 meeting, you expressed the view that the DOI's requirement for a "private cloud" was based on the DOI's "business needs" and on "industry best practice." Although those DOI officials present at the meeting declined to elaborate on the nature of the DOI's "business needs," we believe that the foregoing discussion demonstrates that those needs can be satisfied just as well with a FISMA certified and accredited "Government-only" cloud such as that offered by Google. Regarding what represents "industry best practice," we believe several points are worth mentioning that undermine the DOI's apparent belief that a "private cloud" infrastructure represents such practice.

First, Google has active federal customers today, the U.S. Department of Energy ("DOE") and the U.S. Department of Education, using our cloud technology in production. Interestingly, according to a recent OMB report on the "State of Public Sector Cloud Computing" throughout the Federal Government, Microsoft does not claim to have any references for its "private cloud" BPOS-Federal messaging product.

Second, more than 50,000 companies, including 15% of the Fortune 500, use Google's cloud-based, anti-spam, anti-virus capability. Major organizations such as Motorola, Seagate, Mead-WestVaco, and Land Rover Jaguar, the City of Orlando, City of Los Angeles, and the DOE use Google Apps for messaging and collaboration services. None of these Google solutions is classified as a "private cloud."

Finally, it is ironic that the DOI operates the National Business Center ("NBC"), whose operations and business model are based on cross-servicing IT applications, such as payroll and other financial management functions, for numerous federal agencies in a

1600 Amphitheatre Parkway
Mountain View, California 94043



Tel: 650.623.4000
Fax: 650.618.1806
www.google.com

multi-tenant environment. If the NBC's customers had a requirement for a "private cloud," those agencies would be prohibited from using NBC's services.

## IV.   Conclusion

We trust this letter makes it clear that Google is sincerely interested in the opportunity to compete for the DOI's business and that we believe our Google Apps product would more than satisfy the DOI's needs in an extremely cost-effective manner. We therefore respectfully request that you thoroughly examine the justifications underlying the DOI's preference for a "private cloud" before issuing a solicitation that restricts competition. As we have stated, if security concerns are the real issue, we urge the DOI to include security requirements in the Solicitation that are written in terms of FISMA certifications and controls. In this regard, we would suggest that the Solicitation be released initially in draft form for purposes of obtaining current industry feedback on the Solicitation's terms.

We greatly appreciate your prompt and careful consideration of this request and, if you believe it would be helpful, we are prepared to meet with you and your colleagues at your earliest convenience to explain and demonstrate the similarities – and advantages – of using our Government-only cloud as compared to a private cloud infrastructure.

Very truly yours,

Michael Lock
Vice President
Enterprise Sales

Enclosure - Google's Responses to the DOI's May 27, 2010 requirements

Cc:   Ms. Debra Sonderman
      Director, Office of Acquisition and Property Management and Senior Procurement
                                                                              Executive

      United States Department of the Interior
      Office of the Secretary
      Washington, D.C. 20240

Cc:   Ms. Brigitte Meffert
      Department Competition Advocate
      U.S. Department of the Interior
      Office of the Secretary
      Washington, D.C. 20240

Cc:   Ms. Debra Glass
      Chief, Acquisition Management Division IV

1600 Amphitheatre Parkway
Mountain View, California 94043



Tel: 650.623.4000
Fax: 650.618.1806
www.google.com

U.S. Department of the Interior
Acquisition Services Directorate .
381 Elden St., Suite 4000
Herndon, VA 20170

Cc:   Mr. William Corrington
Chief Technology Officer
U. S. Department of the Interior
Office of the Secretary
Washington, D.C. 20240

Cc:   Mr. Bernard Mazer
Chief Information Officer
U.S. Department of the Interior
Office of the Secretary
Washington, D.C. 20240

Enclosure
Google's Responses to the DOI's May 27, 2010 Questions

Google received a letter from the DOI asking Google to address how the Google Apps solution meets each of the following DOI requirements. During a follow up meeting on June 9, 2010, Google explained that Google Apps could meet each of those requirements. A summary of Google's responses is provided below.

**DOI Requirement 1: Ability to support Microsoft Outlook as the client email application**

*Google Response: YES. Google Apps Sync for Microsoft Outlook® is a Microsoft Outlook® plug in that lets you use Microsoft Outlook® as a client for Google Apps email, calendar, and contacts. Email, calendar events (including recurring meetings), and contact information are all synchronized between Google Apps and Microsoft Outlook®. Google's tool is a MAPI based plug in for increased functionality through native integration.*

**DOI Requirement 2: Ability to support web-based access to email**

*Google Response: YES. Google Apps supports web-based access to email which includes unique capabilities to improve efficient and effective communication from any web enabled device.*

**DOI Requirement 3: Ability to directly integrate (not synchronize) with DOI's implementation of Active Directory for identity management, user authentication, and user authorization.**

*Google Response: Yes.. Google can meet the DOI requirement. Google supports Single Sign-on (SSO) via the SAML 2.0 specification/standard. Google continued to explain that there are a number of enterprise companies that are using SSO which defers the authentication step to the customer infrastructure. There are number of commercial SSO implementations that can integrate directly with MSFT Active Directory to include Ping Identity.*

**DOI Requirement 4: Ability to provide an underlying infrastructure that is operated solely for DOI**

*Google Response: Yes. The service for DOI can be isolated to a single domain run on a logically separate network. Further Google can run service for DOI in a dedicated cloud run for U.S. Government customers only.*

**DOI Requirement 5: Ability to meet FISMA security certification requirements**

*Google Response: Yes. Google is the first company to submit its complete Certification and Accreditation package to the General Services Administration. GSA expects to issue an ATO for Google Apps by June 30, 2010.*

Enclosure
Google's Responses to the DOI's May 27, 2010 Questions

**DOI Requirement 6: Procedures for responding to security and privacy breaches including reporting requirements defined in OMB Memorandum M-07-16**

*Google Response: Yes. This is documented in the Security Package supporting our FISMA accreditation. Documentation has been available for review on an ongoing basis to appropriate DOI employees. "Google reports security incidents to the U.S. General Services Administration in accordance with the response procedures and criteria agreed-upon with GSA. These procedures are documented in Appendix F 'Handling IT Security Incidents for U.S. Government Customers' of the Google Apps Premier Edition System Security Plan. GSA coordinates the notification of any incidents with applicable U.S. government stakeholders including end-user agencies and US-CERT. GSA facilitates the communication between Google and U.S. government agencies to ensure an efficient and coordinated response."*

**DOI Requirement 7: Ability to provide financially-backed uptime commitments**

*Google Response: Yes. Further, Google leads the industry in messaging service uptime and supplies all enterprise customers with a financially backed SLA.*

**DOI Requirement 8: Ability to provide blackberry services including:**
- **Implementation of Blackberry Enterprise Server (BES) within the Google infrastructure**
- **Ability to require the use of FIPS 140-2 encryption on Blackberry devices**
- **Ability to set security policies for password length, complexity, retention, etc.**
- **Ability to support other mobile devices, specifically iPhone, Android and Windows Mobile**

*Google Response: Yes. DOI clarified their objective to not have any messaging infrastructure on premise at DOI and Google confirmed this can be supported. Further, with regard to other mobile devices, Google Apps provides users with seamless access to information regardless of location or device. These include iPhone, Android and Windows Mobile devices. Google provides the Active Sync service to maintain enterprise level security and administration and controls for both iPhone and Windows Mobile devices. http://googleenterprise.blogspot.com/2010/02/google-apps-adds-enterprise-admin_03.html*

**DOI Requirement 9: Ability to integrate with SharePoint and other document collaboration and sharing tools**

*Google Response: Yes. Google Apps provides high fidelity interoperability with industry standard document and collaboration tools which can expand or augment existing capabilities. In addition, Google Apps delivers many unique features and functions which will provide DOI new innovations for improving efficiencies and effectiveness of collecting, creating, and sharing information internally and externally.*

Enclosure
Google's Responses to the DOI's May 27, 2010 Questions

**DOI Requirement 10: Ability to provide instant messaging and desktop video**

*Google Response: Yes. Google Apps delivers a unified messaging solution where DOI can email, instant message, and make high-quality voice and video communication without launching a separate application. Instant Messaging supports text, SMS, voice and video messaging. The instant messaging feature is also available as a standalone client.*

**DOI Requirement 11: Ability to integrate email, desktop video, and voicemail using Voice over IP (VOIP) technology**

*Google Response: Yes. Google Apps is a fully integrated service which delivers all these capabilities and much, much more with no need to deploy software or hardware.*

**DOI Requirement 12: Ability to archive email to meet legal retention and e-discovery requirements, support for search of email archives that:**
- **Uses DOI's implementation of Active Directory to determine who is allowed to search email archives for certain subsets of DOI mailboxes**
- **Allows the use of search criteria such as date, sender, receiver, subject, keywords, etc.**

*Google Response: Yes. In addition, Google provides tools to integrate with Active Directory, and Google exceeds industry standard practices by providing unlimited storage.*

CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2010, I caused two copies of the Plaintiffs'

Complaint, together with Plaintiffs' supporting Exhibits, to be served by hand delivery upon:

> Christopher L. Krafchek
> U.S. Department of Justice
> Commercial Litigation Branch
> 8th Floor
> 1100 L Street, N.W.
> Washington, D.C.  20530

_____
Timothy Sullivan