**ORIGINAL**

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### Bid Protest

FILED

OCT 2 9 2010

U.S. COURT OF
FEDERAL CLAIMS

GOOGLE, INC.
1600 Amphitheatre Parkway
Mountain View, CA 94043,

and

ONIX NETWORKING CORPORATION
26931 Detroit Road
Westlake, OH 44145,

      Plaintiffs,

    v.

THE UNITED STATES,

      Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. **10-743 C**

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

Timothy Sullivan
1909 K Street, N.W., 6th Floor
Washington, D.C. 20006
(202) 585-6930 (tel.)
(202) 508-1028 (fax)

Attorney of Record for Plaintiffs Google, Inc.
and Onix Networking Corporation

Of Counsel:

Katherine S. Nucci
Scott F. Lane
Thompson Coburn LLP

Dated: October 29, 2010

**TABLE OF CONTENTS**

I.      Introduction.................................................................................................................2

II.     Statement of the Questions Involved ..........................................................................2

III.    Factual Background .....................................................................................................3

        A.      Discussions Prior to DOI's Issuance of the RFQ......................................................3

        B.      The RFQ.......................................................................................................11

        C.      DOI's Limited Source Justification .............................................................13

        D.      The Microsoft BPOS-Federal Solution.......................................................17

        E.      Google's GAO Protest ................................................................................19

IV.     This Court Has Jurisdiction ......................................................................................20

V.      Plaintiffs' Standing...................................................................................................21

VI.     Standards for Injunctive Relief .................................................................................25

        A.      Likelihood of Success on the Merits............................................................26

                1.      The "Limited Source Justification" Lacked A Rational
                        Basis.................................................................................................28

                        a.      The Justification Did Not Comply With FAR 8.405-
                                6(a)(2) ...................................................................................28

                        b.      DOI's Alleged Need For A Federal-Government-
                                Only Cloud For Hosting Its Messaging Solution Is
                                Not Rationally Based ...............................................................30

                        c.      Microsoft BPOS-Federal Does Not Meet DOI's
                                Asserted Needs........................................................................33

        B.      Irreparable Injury To Plaintiffs....................................................................37

        C.      Balance of Hardships ..................................................................................38

        D.      Public Interest .............................................................................................39

VII.    Conclusion ................................................................................................................41

**TABLE OF AUTHORITIES**

**Cases**

*Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054 (Fed. Cir. 2000) ........................26

*Advanced Systems Technology, Inc. v. United States,* 69 Fed. Cl. 474 (2006)..............................39

*Allied Materials & Equip. Co. v. United States,* 81 Fed.Cl. 448 (2008)........................................22

*Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345 (Fed. Cir. 2004) ......................21, 26

*CCL, Inc. v. United States,* 39 Fed. Cl. 780 (1997) .................................................................22, 24, 25

*CIGNA Gov't Servs., LLC v. United States*, 70 Fed. Cl. 100 (2006)...............................................27

*Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 266 (1997) ...........................................................39

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971), *abrogated
    on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977) ...........................................26

*CW Gov't Travel v. United States*, 61 Fed. Cl. 559 (2004) .............................................................24

*Delbert Wheeler Constr., Inc. v. United States*, 39 Fed. Cl. 239 (1997) .........................................25

*Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071 (Fed. Cir. 2001).......................27

*FMC Corp. v. United States*, 3 F.3d 424 (Fed. Cir. 1993) .........................................................25, 26

*Gentex Corp. v. United States,* 58 Fed. Cl. 634 (2003)...................................................................38

*Magellan Corp. v. United States,* 27 Fed. Cl. 446 (1993)...........................................................38, 39

*Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Automobile Ins.
    Co.*, 463 U.S. 29 (1983) ....................................................................................................26, 27

*Northrop Grumman Corp. v. United States*, 50 Fed. Cl. 443 (2001)..............................................24

*OMV Med., Inc. v. United States,* 219 F.3d 1337 (Fed. Cir. 2000) .................................................27

*Overstreet Elec. Co. v. United States,* 47 Fed. Cl. 728 (2000)..................................................26, 38

*PGBA, LLC v. United States,* 57 Fed. Cl. 655 (2003)..................................................26, 27, 38, 39

*RAMCOR Services Group, Inc. v. United States*, 185 F.3d 1286 (Fed. Cir. 1999) .......................21

*Rotech Healthcare, Inc. v. United States,* 71 Fed. Cl. 393 (2006) ..................................................39

*Savantage Financial Services, Inc. v. United States*, 81 Fed.Cl. 300 (2008) ...............21, 22, 23, 25

*Seattle Sec. Servs., Inc. v. United States.*, 45 Fed. Cl. 560 (2000) ............................................26, 38

*Weeks Marine, Inc. v. United States,* 575 F.3d 1352 (Fed. Cir. 2009) ....................................21, 22

*WinStar Communications, Inc. v. United States,* 41 Fed.Cl. 748 (1998) ........................................22

## Statutes and Regulations

5 U.S.C. § 706(2)(A)................................................................................................................26

28 U.S.C. § 1491(b)(1) .......................................................................................................21, 23

28 U.S.C. § 1491(b)(3) ...............................................................................................................38

28 U.S.C. § 1491(b)(4) ...............................................................................................................26

31 U.S.C. § 3551(2) ....................................................................................................................22

41 U.S.C. 253(a) .........................................................................................................................40

44 U.S.C. §§ 3541.........................................................................................................................3

4 C.F.R. § 21.0(a)(1) ...................................................................................................................20

FAR (48 C.F.R) 8.405-1(c) .........................................................................................................11

FAR (48 C.F.R) 8.405-6 ..............................................................................................................28

FAR (48 C.F.R) 8.405-6(a)(2)................................................................................................15, 28

FAR (48 C.F.R) 8.405-6(g)(2)(i)-(x)...........................................................................................28

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
**Bid Protest**

|  |  |
|---|---|
| GOOGLE, INC.<br>1600 Amphitheatre Parkway<br>Mountain View, CA  94043,<br><br>and<br><br>ONIX NETWORKING CORPORATION<br>26931 Detroit Road<br>Westlake, OH  44145,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  No._____<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

Plaintiffs Google, Inc. ("Google") and Onix Networking Corporation ("Onix"), by and through their undersigned Attorney of Record, respectfully request that this Court issue a temporary restraining order and preliminary and permanent injunctive relief, and/or a declaratory judgment, prohibiting the Defendant from proceeding in any manner with the procurement identified as U.S. Department of the Interior ("DOI") Request for Quotation No. 503786 (the "RFQ"), or any related procurement, solicitation or task order, pending final resolution of the Plaintiffs' protest against the DOI's RFQ.  In support of this motion and application, Plaintiffs state as follows:

## I.    <u>Introduction</u>

Plaintiffs protest DOI's RFQ, which seeks quotations for the acquisition of the Microsoft Business Productivity Online Suite-Federal ("BPOS-Federal") email and collaboration services solution ("messaging solution") to support the approximately 88,000 users throughout the agency, and more specifically the underlying "Limited Source Justification," executed on August 30, 2010, that was made public along with the RFQ.  Plaintiffs are seeking a temporary restraining order and injunctive and declaratory relief against DOI proceeding with the RFQ or any related procurement without complying with applicable statutory and regulatory requirements, including but not limited to conducting a competition in accordance with applicable law and regulations to select a hosted messaging solution that satisfies the DOI's minimum needs and represents the best value to the agency.

Google is the developer and owner of many computer software products and solutions, including its Google Apps Premier and Google Apps for Government messaging solution. Google Apps is used by more than 30 million users at three million schools, businesses, and government agencies at the federal, state and local levels.  Google licenses its software products and solutions either directly to customers or indirectly through licensed resellers.  Onix is a licensed reseller of Google products, including Google Apps, via a reseller agreement with Google.  Onix has a GSA Schedule 70 contract through which Google products may be purchased by the Government.

## II.    <u>Statement of the Questions Involved</u>

A.    Whether Plaintiffs are entitled to injunctive relief because:  (i) Plaintiffs are likely to succeed in demonstrating that Defendant's conduct in issuing the RFQ, which specified the Microsoft BPOS-Federal solution on the basis of a "Limited Source Justification" stating that BPOS-Federal is the only messaging solution that can satisfy the DOI's needs, is arbitrary and

capricious, an abuse of discretion, and not in accordance with applicable law; (ii) the balance of

harms weights in Plaintiffs' favor; (iii) the public interest favors the issuance of injunctive relief

in Plaintiffs' favor; and (iv) Plaintiffs will suffer irreparable harm if their request for injunctive

relief is denied.

      B.      Whether Plaintiffs are entitled to a declaratory judgment that the DOI's RFQ, and

the underlying "Limited Source Justification," are arbitrary and capricious, an abuse of

discretion, and contrary to applicable statutes and regulations.

## III.    Factual Background

      A.      Discussions Prior to DOI's Issuance of the RFQ

      The following chronology of Google's efforts to engage DOI in substantive discussions

regarding the technical and cost-saving benefits of the Google Apps solution for the DOI's

messaging requirements make clear that Google's product was never given serious consideration

by the DOI. Even though Google Apps is a proven, enterprise-ready solution that has received a

Federal Information Management Security Act ("FISMA") security authorization from the U.S.

Government ("FISMA certification")[1], and is interoperable with Microsoft software at a

dramatically lower total cost of ownership, it is readily apparent that the DOI, which repeatedly

refused to pilot Google's product or even review its security certification package, conducted

---

[1] The FISMA Act of 2002, 44 U.S.C. §§ 3541 *et seq.*, applies to all information systems in use by U.S. Government
agencies to help ensure they are secure. The FISMA Act requires each federal agency to develop, document, and
implement an agency-wide program to provide information security for the information and information systems
that support the operations and assets of the agency, including those provided or managed by another agency,
contractor, or other source. Any information system used by the Federal government must undergo a
comprehensive security certification and accreditation process, including an assessment of the management,
operational, and technical security controls in the information system. Google's Google Apps for Government is the
first cloud computing collaboration platform to receive FIMSA certification. The Google Apps Security
Authorization letter, dated July 22, 2010 and signed by the Authorizing Official and Senior Agency Information
Security Officer of the General Services Administration ("GSA"), states: "After reviewing the results of the Google
Apps Cloud information system and the supporting evidence provided in the associated security authorization
package (including the security assessment, report system, security plan, penetration test report, plan of action and
milestones, contingency plan, and contingency plan test report), I have determined that the risk to Federal agency
operations, data, or assets resulting from the operation of the system is acceptable."

only superficial and wholly-inadequate "market research" before determining DOI's minimum needs and that only the Microsoft BPOS-Federal solution can satisfy those purported needs.

The events behind this dispute began over a year ago. In June 2009, Google representatives met with the DOI Chief Technology Officer ("CTO"), who outlined the general functional requirements that the DOI had defined to meet its need for an improved e-mail, calendaring and collaboration system. Google confirmed that all outlined needs could be met with its Google Apps product, and requested an opportunity to meet again with DOI to further discuss DOI's needs in greater detail and to provide the DOI with a fuller understanding of the technical and security aspects of the Google Apps solution. No meetings on this topic were held between Google and the DOI until February 2010, when DOI representatives accepted a Google request for an executive introductory meeting. The agenda included executive introductions, an update on the FISMA certification status of Google's messaging solution, Google Apps, for federal government use, and Google's request to meet further for more detailed discussions.

Despite repeated requests and offers from Google for such detailed discussions, the next follow-up from DOI was acceptance of an invitation to a public Google session in April 2010 where Google provided information about its enterprise computing vision, why large organizations have selected Google's technology and the benefits they have experienced, and how to begin a cloud computing initiative at a federal agency. The public session was attended by then-U.S. Fisheries and Wildlife Service Chief Information Officer ("CIO"), Mr. Bernard Mazer (who subsequently became the DOI CIO), and the DOI CTO, Mr. William Corrington, who informed Google that a "path forward had already been chosen" for the DOI Messaging solution and there would be no opportunity for Google to compete because its product was not compliant with DOI's security requirements. Despite Google's many requests for such

information, the DOI declined to define its security requirements or to meet with Google to conduct more detailed discussions about Google Apps, including a full review of Google's security documentation.  Google then contacted the DOI's National Business Center's Chief Contracting Officer, Ms. Debra Glass, by sending her a formal letter of interest on May 17, 2010. That letter expressed Google's keen interest in competing for DOI's Messaging solution, and outlined the technological and financial advantages of the Google Apps solution.  Google also expressed its view that a solicitation with brand-name specific requirements would violate CICA's requirements and would unfairly preclude the offer of Google Apps or any other competitive or innovative software product.  *See* Exhibit A attached to Plaintiff's Complaint.

On May 27, 2010, Ms. Glass sent Google a letter that did not respond to or reference Google's May 17 letter, but instead requested that Google respond to fifteen broadly-worded requirements to "enhance" the DOI's market research.  Those questions notably requested a discussion of Google's "[a]bility to meet FISMA security certification requirements" and Google's "[a]bility to provide an underlying infrastructure that is operated solely for DOI."  The letter claimed that market research had been conducted by DOI between October 2009 and March 2010.

On June 9, 2010, Google met with DOI representatives in an effort to "enhance" the DOI's market research.  Those attending from the DOI included: Mr. Andrew Jackson, Deputy Assistant Secretary for Technology, Information and Business Services; Ms. Debra Sonderman, Director, Office of Acquisition and Property Management; Mr. Mazer; and Mr. Corrington. During the meeting, Mr. Jackson stated that the DOI had previously standardized on Microsoft solutions, but he claimed the DOI was nevertheless committed to conducting a full and open competition.  In turn, Google explained how its product would satisfy each of the DOI

requirements outlined in the May 27, 2010 letter.  The DOI representatives expressed some

concern regarding whether Google could provide an underlying infrastructure that was operated

solely for the DOI.  Google explained that the service for DOI can be isolated to a single domain

that is run on a logically separate network.  Further, Google explained how its Government-only

cloud (reserved for federal, state, and local governments) would sufficiently address DOI's

concerns.  Google also requested that DOI provide a comprehensive list of objectives and

requirements to which Google could respond; however, DOI never provided such information to

Google.

   Google followed up this meeting with another letter addressed to Mr. Jackson on June 17,

2010.  *See* Exhibit B attached to Plaintiff's Complaint.  Google enclosed with the letter written

documentation demonstrating that Google Apps could meet or exceed each of the requirements

described in the DOI's May 27, 2010 letter.  Regarding DOI's alleged need for an underlying

infrastructure operated solely for DOI, Google explained that such a "private cloud" was not

required for security certification under FISMA and, similar to GSA's recent solicitation for

"Enterprise E-Mail and Collaboration Services" from a commercial provider of Cloud

Computing services and software, DOI could address its security requirements by requiring that

the contractor "provide security controls that are confirmed to meet the security standards for

Moderate Impact systems as described in NIST SP 800-53 with an accepted Certification and

Accreditation (C&A)." Google also explained that DOI's requirement for a private cloud did not

represent "industry best practice," referencing examples of federal Government entities and

major organizations that use Google Apps.  In fact, as Google pointed out, the only Federal

customers that were using a cloud e-mail system were using Google Apps.  Google further

pointed out that recent full and open competitions for cloud e-mail solutions in state and local

municipalities, such as the City of Los Angeles and the State of Colorado, had chosen Google

Apps over Microsoft's cloud solutions.  Finally, since Mr. Jackson had referenced certain

authority from a 2002 Microsoft standardization decision, Google reminded the DOI that

standardization decisions are not licenses to circumvent the CICA.

Mr. Jackson responded to Google's letter by email on June 18, 2010 with a follow-up

question and the following assurances:

> Also, I feel I need to clarify a misconception noted in your letter.
> As I stated last week, DOI has not finalized its procurement
> strategy for the planned cloud messaging solution. We continue to
> evaluate all options in light of our business requirements.

A similar response was received on June 23, 2010 from Ms. Brigitte Meffert, DOI's Competition

Advocate, a recipient of Google's May 17 letter.  Ms. Meffert's response acknowledged receipt

of the letter and asserted on behalf of the Office of Acquisition and Property Management that it

was "confident that Google, and all interested parties, will be treated fairly during the process."

On June 23, 2010, Google answered Mr. Jackson's follow-up question, explaining that

Google was committed to meeting federal security requirements and would commit to meeting

any DOI-defined implementation timelines.  In addition, Google alerted Mr. Jackson to rumors

circulating in the industry that DOI had already selected a Microsoft product:

> Finally, we are encouraged by your clarification that the DOI has
> not finalized its procurement strategy for the planned cloud
> messaging solution and is continuing to evaluate all options in light
> of DOI's business requirements. However, we believe you should
> know that we continue to hear very disconcerting rumors that
> project deployment activities are already underway to migrate the
> DOI to a pre-determined messaging solution notwithstanding the
> lack of any legitimate market research or a "full and open"
> competition for the DOI's messaging solution.  We would therefore
> appreciate your confirmation that product selection remains part of
> DOI's procurement strategy that is currently being defined.

Later that same day, Mr. Jackson responded with another question and further assurances

indicating that the "messaging provider" had not been selected despite the rumors heard by

Google:

> As for the "disconcerting rumors" you allude to below, I would
> encourage you to treat rumor and innuendo as just that. As I am
> sure you are aware, moving from 13 separate messaging platforms
> to 1 messaging instance is necessarily a traumatic process for many
> of our bureaus.  It is one of the challenges of bringing
> transformative change to a very decentralized department. We have
> of course required our bureaus to commence preparations for a
> migration to our new messaging system, and we believe that these
> preparation activities will be useful for a successful migration, no
> matter which messaging provider is ultimately selected.  If you are
> being told otherwise, I would request that you recommend that
> your source contact me directly, so that I can help correct any
> misconceptions.

The next day, June 24, Google responded by thanking Mr. Jackson for his assurances that

the procurement strategy and product selection were still being evaluated.  In doing so, Google

reaffirmed its sincere interest in competing for DOI's Messaging requirements.  Google again

explained that DOI's security requirements can be stated in terms of FISMA certifications and

controls without requiring a particular infrastructure or computing delivery model.  Finally,

Google notified DOI that its Government-only cloud (federal, state and local) had been

completed ahead of schedule and was available with the capabilities that had been discussed with

the DOI.

Mr. Jackson did not respond to Google's June 24 email.  On July 19, Google attempted to

reach Ms. Meffert, the Competition Advocate, by telephone.  Ms. Meffert responded in an e-mail

message that she had no information to provide and that Google should speak to Ms. Glass, the

contracting officer.  Google followed up with Ms. Glass that same day, re-emphasizing its

interest in competing for DOI's Messaging solution requirement.  Google was told that there had been no developments and that the next step would be the issuance of a solicitation.

Google also sent another e-mail to Mr. Jackson on July 26, 2010.  In this e-mail, Google notified Mr. Jackson that Google Apps had recently been approved as the first suite of cloud-computing applications to receive a FISMA certification and accreditation from the Government.  Additionally, Google continued to express concerns about information it heard from market research discussions with other Federal agencies.  Specifically, Google alerted Mr. Jackson that Google had heard that DOI might soon issue to a competitor (meaning Microsoft) a FISMA certification and accreditation for the competitor's cloud-computing messaging system, even though DOI had repeatedly refused to review Google's FISMA certification package.  Google also informed Mr. Jackson that no Microsoft cloud product had received a FISMA certification from the GSA, which is the managing agency responsible for implementing the President's government-wide cloud computing initiative.  After a week had passed with no response, Google sent another e-mail to Mr. Jackson requesting confirmation that DOI was still planning a competitive solicitation, and asking if there were any opportunities for Google to pilot or demonstrate its product offering.  Mr. Jackson immediately responded that all correspondence had to be directed to Ms. Glass.

Google responded later that day to Ms. Glass and Mr. Jackson asking to whom discussions should be routed and whether they could discuss any updates, announcements or areas of interest.  Mr. Jackson again responded only to state that questions should be routed through Ms. Glass, who did not respond.

On August 2, 2010, Google sent an e-mail to Mr. Corrington, DOI's CTO, to ensure that he had seen the public announcement that Google Apps was the first suite of cloud-computing

messaging and collaboration applications to receive FISMA certification and accreditation.
Google also request confirmation from Mr. Corrington as to DOI's plans for a competitive
procurement for the selection of a messaging solution.  On August 3, Mr. Corrington responded
by stating that all correspondence and phone calls should be directed to Ms. Glass.

On August 11, 2010, Google reached out to Mr. Jackson and Ms. Glass one more time to
express Google's concerns that recent information it had received conflicted with DOI's past
assurances that Google would have an opportunity to compete for DOI's Messaging
requirements.  Google attached to the e-mail a DOI screen shot, which indicated that a "pilot"
project to migrate 5,000 DOI users to the Microsoft platform had been underway for months.
Google explained that the "pilot" would severely harm any future competition and requested that
DOI conduct a similar test program using the Google Apps solution in order to fairly compare
the technologies.  It was surprising to Google that, despite DOI's stated concerns about
information security for its e-mail system, the agency was willing to conduct a large-scale pilot
of a technology that had not received a FISMA certification from any Federal agency and
therefore could not attest to how the Microsoft BPOS-Federal solution met the required National
Institute of Standards and Technology ("NIST") 800-53 security controls or properly evaluate or
document the residual level of information security risk to DOI as all Federal agencies are
required to do under the FISMA Act.

Neither Mr. Jackson, Ms. Glass nor any other DOI official responded to Google's August
11 e-mail.  On September 8, 2010, after intervention by the Office of the Solicitor at the request
of Google's counsel, Ms. Glass finally advised Google's counsel that an RFQ had been issued
via GSA's e-Buy and that offers were due within days.

B.    The RFQ

The RFQ was posted on e-Buy on August 30, 2010.  The RFQ requests offerors to submit

proposals providing hosted e-mail and collaboration services for all DOI bureaus and offices.

The contract is intended to be a single award, firm-fixed-price Blanket Purchase Agreement

awarded against a GSA Federal Supply Schedule.[2]  The period of performance will end after five

years, unless the maximum dollar threshold of $59.3 million is reached first.  The RFQ requires

offerors to submit three proposal volumes:  Volume 1 – Management/Technical Approach;

Volume 2 – Past Performance; and Volume 3 – Price/Business.  The RFQ's instructions advised

prospective offerors to submit questions or comments by noon on September 3, and that the

initial due date for proposal submission is September 10, 2010.

The offerors' Management/Technical Approach proposal, limited to 17 pages, is required

to "reflect a thorough understanding of the requirements and a detailed description of techniques,

procedures and tools used for achieving the objectives of the Statement of Work (SOW)."  The

Past Performance proposal, limited to three pages, could include references from the Federal

government, state or local governments, quasi-government organizations within the USA,

educational entities, or commercial organizations within the USA within the past three years.

Those references are required to demonstrate how successful the offerors "have been in the past

to complete all aspects of the SOW."  The offerors' Price/Business proposals are required to

include a completed pricing table and any associated assumptions.

Section L.9 of the RFQ states that the Government would make an award to the

contractor that "represents the best value, price and other factors considered."  The RFQ advises

---

[2]  Google questions whether DOI complied with the requirements at FAR 8.405-1(c) in that there do not appear to be
at least three schedule contractors listed on the GSA Advantage! on-line shopping service that offer the Microsoft
BPOS-Federal solution.  A search of the GSA Advantage! Website reveals no schedule contractors offering the
Microsoft BPOS-Federal messaging solution, and only one contractor, Softchoice Corporation, offering the
Microsoft BPOS-Dedicated messaging solution.

that "[t]echnical evaluation factors [were] more important than price; however, between quotes that are evaluated as technically equal in quality, price will become a major consideration in selecting the successful Offeror."  Section L.8 of the RFQ explains that the Management/ Technical Approach would be evaluated based on 1) evidence of infrastructure and specific methods for support; 2) the resellers' described ability to anticipate problems; and 3) the resellers' described standard reports.  Past Performance proposals would be evaluated based on evidence of success supplying similar services and evidence of the ability to advocate for client issues with a manufacturer.  The RFQ does not describe how the Price/Business proposal will be evaluated or what the source selection team might consider to evaluate price reasonableness.  Rather, the RFQ states that "[w]hen combined, the non-price factors are more important than price."

The SOW sets forth the technical requirements applicable to the Messaging solution.  The Background section contains a two-page discussion regarding cloud computing and describes a "risk assessment" conducted by DOI resulting in DOI's conclusion that it requires the following attributes of a cloud computing deployment:

- Compliance with security requirements defined by the Federal Information Security Management Act (FISMA) along with enhanced DOI-specific security requirements
- Dedicated data storage infrastructure  (both physically and logically) to DOI or to DOI and other Federal government customers only
- Dedicated  computing infrastructure (both physically and logically) to DOI or to DOI and other Federal government customers only
- Implementation of at least two data centers located within the continental United States.
- Enterprise e-mail and collaboration services provided by an external vendor as a standardized service offering

The stated requirement for an infrastructure that is dedicated to DOI and other Federal government customers only is not explained in the SOW.  However, the SOW states that

"extensive market research" led to a determination that the Microsoft BPOS Federal solution was "the DOI's product selection of choice."  Further, the SOW explains that a 2002 Microsoft standardization decision was reviewed and re-affirmed in an updated standardization memo in July 2010.

The requirements outlined by the SOW reflect an emphasis on compliance with FISMA security controls.  Section 2.1, "Information Security," provides as follows:

> Underlying all of the requirements described herein is the need for DOI to meet the obligation to secure the messaging and collaboration system in compliance with the Federal Information Systems Management Act (FISMA) …

Similarly, Section 10.5, "Security Requirements," states that the DOI's risk assessment resulted in a determination the DOI needed to implement a system that was FISMA-compliant, and Section 10.5.3 requires that "[a]t all times, the Contractor shall comply and the Contractor shall cause Microsoft to agree to comply with the [FISMA]."  As the SOW acknowledges, the Microsoft BPOS-Federal product is not yet FISMA-certified.  As such, this essential element would be pursued and developed during contract performance.  A discussion on how the Contractor, Microsoft, and DOI can, at some unknown point in the future, establish the technological controls to achieve this critical certification follows in Sections 10.5.3 and 10.5.4.

Significantly, the SOW requirements and even certain terminology are closely aligned with Microsoft's product literature for its Exchange Online, SharePoint Online, and Office Communications Online applications.  Of course, this is because DOI had defined its needs and requirements around the Microsoft products.

C.     DOI's Limited Source Justification

The background section of the RFQ's SOW, described above, was based upon a "Limited Source Justification" ("Justification") executed by the Director of DOI's Office of Acquisition

and Property Management on August 30, 2010.[3]  The Justification states that two features of the

Microsoft BPOS-Federal suite (consisting of hosting services, Exchange Online, SharePoint

Online, and Office Communications Online) are critical to the DOI's successful implementation

of a transition from a disparate and disjointed email message system to a consolidated and secure

system, and form the basis for the Justification.  Those features are a unified and consolidated

email system and enhanced security.

The Justification describes DOI's current email implementation, which consists of 13

systems owned and operated by each bureau and office supporting approximately 85,000 users,

and DOI's failed efforts during 2002-2006 to obtain an e-mail system custom-built by a systems

integrator to DOI's specifications.  After that project was cancelled in 2006, DOI began

researching other options for a centralized e-mail system.  The Justification then describes the

security challenges associated with implementing a department-wide e-mail solution, as follows:

> Underlying the requirement for a functioning email system is the
> need for the Department to universally meet the obligation of a
> secure enterprise messaging, collaboration and storage system.  In
> order to maintain a robust approach to achieving its mission, the
> Department requires the ability to seamlessly share, store and
> integrate information in a highly secure environment.  This
> requirement is based not only on Federal security requirements; it
> is also based on the diverse functions of DOI.  In particular, the
> Department has the primary fiduciary duty to manage tribal trust
> funds and Individual Indian Money (IIM) accounts, as well as the
> resources that generate income for those accounts.  The
> Department also has a fiduciary duty to protect procurement and
> business sensitive communications for itself, its collaborators and
> its customers.  Furthermore, the Department has law enforcement
> and investigative authorities, resource protection and management
> authorities (especially with regard to culturally sensitive areas);
> and lab and research authorities which also subject the Department
> to rules and regulations regarding collection, storage and sharing of
> protected information.

---

[3]  The Justification was first executed by the DOI's CIO, Mr. Bernard Mazer, and the CTO, Mr. William Corrington, on August 19, 2010.

Next, under the heading "Identifying Solutions," the Justification states as follows:

> The commercial market has developed several solutions that may
> better meet the needs of the federal Government as a whole,
> including cloud computing models. Given the rapidly changing
> technical environment, the Department needed to assess what
> model would best meet its current needs. To that end, the
> Department determined that a dedicated private cloud service
> model, combined with robust messaging and collaboration tools
> would best meet its current needs.

Section 3 of the Justification describes the specific "supplies or services required to meet

the agency's needs." The first requirement that "must be met by a messaging and collaboration

system in order to support the DOI mission" was identified as "Core Functionality," described as

follows:

> In a standardization memo issued in September 2002, DOI
> established Microsoft Office suite as a departmental standard. In
> July 2010, the standardization decision was reviewed and re-
> affirmed through the issuance of an updated standardization memo.
> The Microsoft Office suite includes the Microsoft Outlook e-mail
> client, which provides a full-featured e-mail system that also
> provides calendaring and scheduling functionality.

Seven additional requirements are described in Section 3, including "Information Security"

headlined by "the need for DOI to meet the obligation to secure the messaging and collaboration

system in compliance with the Federal Information Systems Management Act (FISMA) and

other Federal security requirements." Section 3 concludes by stating that the estimated contract

award amount "will be $59 million over the expected five (5) year contract life cycle."

Section 4 of the Justification describes DOI's rationale, under FAR 8.405-6(a)(2), for "the

acquisition of an item peculiar to one manufacturer." According to the Justification, DOI utilized

the "accepted methodology" set out by the Cloud Security Alliance ("CSA") and NIST to

determine "its risk tolerance for implementing current solutions in light of its goals, objectives

and mission." According to the Justification:

> Specifically, DOI followed an assessment process recommended
> by the CSA to establish that the following attributes of a cloud
> computing deployment meet DOI's requirements for the
> implementation of an enterprise email and collaboration system:
>
> - Collaboration services provided by an external vendor as a
>   standardized service offering
> - Ability to comply with security requirements defined by
>   FISMA
> - A data storage infrastructure that is solely dedicated (both
>   physically and logically to DOI or to DOI and other Federal
>   government customers only
> - A computing infrastructure that is solely dedicated (both
>   physically and logically to DOI or to DOI and other Federal
>   government customers only
> - Implementation at a minimum of two data centers that are
>   located within the continental United States

Significantly, the Justification did not evidence or explain why DOI relaxed its requirement from

an underlying infrastructure operated solely for the DOI, as set forth in DOI's May 27, 2010

letter to Google (*see* Exhibit B, attached to Plaintiff's Complaint, and its attachment reiterating

DOI's requirements), to an underlying infrastructure provided to DOI and any other Federal

government customers.  More importantly, DOI's so-called risk assessment does not appear to

have involved an analysis of the risks or benefits of housing only DOI data, versus housing data

of just Federal government agencies, or versus housing data of a mix of Federal, State and local

agencies, nor does it appear that DOI conducted an empirical review of the NIST 800-53 security

controls  in place for the Microsoft BPOS-Federal (or any other) system.

The Justification states that DOI had conducted "extensive market research" soliciting

product and Federal security compliance information from vendors, trusted third-party research,

and other Federal government informational resources.  According to DOI, "[m]ethodology

included personal knowledge, contacting knowledgeable individuals in Government and

industry, reviewing recent market research results for similar services, and reviewing generally

available product literature." DOI concluded: "Based on this extensive market research, the

Department determined that although many companies can provide messaging services in

general, they either cannot provide services that address the complexity of messaging

requirements within DOI, or they could not meet the degree of security required by DOI."

The Justification states the following conclusion: "Based on the risk assessments and

market research conducted, the Department determined that the Microsoft BPOS solution is the

only commercial product that satisfies every requirement identified by the Department."

     D.    The Microsoft BPOS-Federal Solution

There is very little to no publicly-available information about the Microsoft BPOS-

Federal solution other than a Microsoft press release on its website. The press release states that

Microsoft announced on February 24, 2010, at its eighth annual Microsoft U.S. Public Sector

CIO Summit, the unveiling of a number of new enhancements and certifications for its BPOS-

Dedicated solution and the launch of BPOS-Federal. The press release further states that:

> Business Productivity Online Suite Federal is launching today for
> U.S. federal government agencies, related government contractors
> and others that require the highest levels of security features and
> protocols. The new offering includes all the certifications and
> security features of the Business Productivity Online Suite and
> more. The service is housed on separate, dedicated infrastructure
> in secured facilities. Physical access to those systems is limited by
> biometric access controls to a small number of individuals who, in
> compliance with International Traffic in Arms Regulations (ITAR),
> must be citizens of the United States who have undergone rigorous
> background checks, including fingerprinting.

The BPOS-Federal solution is therefore a new product, and there are no publicly-identified

customers who have either purchased or implemented the BPOS-Federal solution. In OMB's

recent report on the State of Public Sector Cloud Computing, there are no case studies reported

of any customer using the BPOS-Federal product.[4]  Moreover, as of the date of this protest, <u>no</u>

BPOS product, including BPOS-Federal, has received a FISMA security authorization from any

government agency at any risk level.  Notably, Microsoft's Certification and Accreditation

package for BPOS that was submitted to GSA earlier this year has not yet been approved,

whereas Google Apps for Government received FISMA certification from GSA in July 2010.

Notwithstanding these glaring deficiencies, DOI has concluded that only the BPOS-Federal

solution can meet the degree of security required by DOI.

Additionally, even prior to the completion of DOI's test use of the solution, DOI

designated BPOS-Federal as the official standard for messaging and collaboration services on

July 15.  This standardization on BPOS-Federal appears to conflict with the Justification's

statement that the determination was made in accordance with 375 DM 12, which is DOI's

departmental manual describing its information resources standardization program.  Section

12.3(A) of the manual provides that the primary objective of the Information Resources

Standards Program is to "promote compatibility and interoperability to minimize costs for

information systems."  The BPOS-Federal solution does not uniquely support compatibility and

is more restrictive of interoperability than other options available to DOI.  There are other

solutions available in the marketplace that are compatible with the Microsoft products selected as

DOI's official standard in 2002, are FISMA certified, and are substantially less expensive to the

customer than BPOS-Federal.

Moreover, according to IBM's X-Force Threat Reports[5], Microsoft topped a list of 12

major software providers for the number of security vulnerabilities and software patches needed

---

[4] That report is available at http://www.cio.gov/pages.cfm/page/State-of-Public-Sector-Cloud-Computing.

[5] *See* http://www.935.ibm.com/services/us/iss/xforce/trendreports/

to plug security holes (23% of "disclosures with no patch") that affect both on-premise and "hybrid" cloud technology, including the Microsoft BPOS-Federal product.  In contrast, Google was the only provider on the list with 0% "disclosures with no patch."  It is surprising that the DOI's "extensive market research" did not uncover this information about Microsoft's security vulnerabilities.[6]  It is also curious that DOI was apparently unconcerned about the numerous outages that Microsoft has experienced this year for BPOS-Standard.  In 2010, Microsoft BPOS-Standard (a larger scale, multi-tenant version of BPOS-Federal) has had 84 downtime incidents (20 planned maintenance, 20 severe incidents, and 44 minor incidents).  In September, Microsoft BPOS-Standard experienced two severe incidents affecting users across North America, which prompted a formal apology,[7] and an acknowledgment that service agreements were violated.[8] Downtime statistics for Microsoft BPOS-Federal are not available likely because it is a new product with no known customers Given DOI's requirement, as specified in the SOW, for 99.95% system uptime, Microsoft's outages this year cast doubt on whether the BPOS-Federal solution will satisfy all of DOI's requirements.  Availability is an important component of information security under FISMA as well as the FIPS 199 Security Categorization process.

   E.   <u>Google's GAO Protest</u>

   On Friday, September 10, 2010, Google filed a timely protest at the U.S. Government Accountability Office ("GAO") against the RFQ's restrictive requirement that offerors only

---

[6] Briefly stated, the likely reason for this difference is that Microsoft BPOS is based on the same Microsoft Exchange and SharePoint servers that are made for an on-premise, legacy model so users inherit the same feature refresh limitations and patch model/security vulnerabilities.  The Google Apps system, on the other hand, was built for the cloud from the ground up, providing continuous access to new features, faster response to security vulnerabilities, and better real-time collaboration.  Only a web browser, rather than client software, is required to use the Google Apps solution.

[7] *See* http://www.zdnet.com/blog/microsoft/microsoft-apologizes-for-spate-of-recent-online-services-outages/7337

[8] *See* http://gen.com/articles/2010/09/13/ecg-microsoft-bpos-outages-slas-affected.aspx

propose the Microsoft BPOS-Federal solution and DOI's determination in the "Limited Source

Justification" that the BPOS-Federal solution is the only product that can satisfy DOI's minimum

needs.  Google's protest alleged that DOI's restriction that the messaging solution's data storage

and computing infrastructure be physically and logically dedicated only to Federal government

customers, which is the primary justification for DOI's selection of the Microsoft BPOS-Federal

solution, is not necessary to satisfy DOI's minimum needs.  The protest further alleged that

Microsoft's BPOS-Federal product did not satisfy the RFQ's restrictive requirement.

On September 30, 2010, DOI filed with the GAO a request for dismissal of Google's

protest on the basis that Google, which does not have a GSA Schedule contract, was not an

"interested party" as defined in GAO's Bid Protest Regulations, 4 C.F.R. § 21.0(a)(1).  Google

opposed the dismissal request on October 4, 2010.  In addition, Plaintiff Onix its own protest on

October 4 with the GAO to effectively join Google's protest because of their common interest,

via its reseller agreement with Google, in challenging DOI's restrictive requirement and seeking

an opportunity to compete for DOI's messaging requirements.  Another licensed reseller, Daston

Corporation, also filed a similar protest on October 4.

On October 25, 2010, the GAO issued its decision dismissing Google's protest on the

ground that Google is not an interested party.  On October 26, the GAO dismissed the Onix

protest.  It appears that the GAO never docketed the Daston protest.

## IV.    **This Court Has Jurisdiction**

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996

("ADRA"), Pub. L. No. 104-320, §§ 12(a)-(b), 110 Stat. 3870 (Oct. 19, 1996), authorizes the

U.S. Court of Federal Claims to "render judgment on an action by an interested party objecting

to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a

proposed award or the award of a contract or any alleged violation of statute or regulation in

connection with a procurement or a proposed procurement").  28 U.S.C. § 1491(b)(1); *see also*

*Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004).

The language of § 1491(b) does not require an objection to a specific solicitation or

award, but only to the "violation of a statute or regulation in connection with a procurement or a

proposed procurement."  "The operative phrase 'in connection with' is very sweeping in scope.

As long as a statute has a connection to a procurement proposal, an alleged violation suffices to

supply jurisdiction."  *RAMCOR Services Group, Inc. v. United States*, 185 F.3d 1286, 1289 (Fed.

Cir. 1999); *see also Savantage Financial Services, Inc. v. United States*, 81 Fed.Cl. 300, 304

(2008).

In this case, Plaintiffs allege violation of the Competition in Contracting Act ("CICA")

and Federal Acquisition Regulation ("FAR") provisions relating to sole-source or brand name

determinations "in connection with" the RFQ.  The DOI actions which Plaintiffs protest are

"connected with" the RFQ because the RFQ embodies and documents the illegal DOI actions,

to-wit, the "Limited Source Justification" wherein DOI irrationally determined that only a

federal-government-only cloud could satisfy its minimum needs and it unreasonably and

improperly stated that only the Microsoft BPOS-Federal messaging solution will satisfy DOI's

minimum needs.

## V.      **Plaintiffs' Standing**

In order to maintain a bid protest action, a protestor must be an "interested party." 28

U.S.C. § 1491(b)(1).  The Tucker Act, however, does not define the term "interested party."  The

U.S. Court of Appeals for the Federal Circuit has adopted the definition of "interested party" set

forth in CICA.  *Weeks Marine, Inc. v. United States,* 575 F.3d 1352, 1359 (Fed. Cir. 2009).  CICA

defines an "interested party" as "an actual or prospective bidder or offeror whose direct

economic interest would be affected by the award of the contract or by failure to award the contract." *Id.*; 31 U.S.C. § 3551(2).

The court relies on a two-part test to determine whether a party qualifies as an interested party. First, "plaintiff must stand in some connection to the procurement." *CCL, Inc. v. United States,* 39 Fed. Cl. 780, 790 (1997). Second, plaintiff "must have an economic interest" in the procurement. *Id.* The court has held that "where a claim is made that the government violated CICA by refusing to engage in a competitive procurement, it is sufficient for standing purposes if the plaintiff shows that it likely would have competed for the contract had the government publicly invited bids or requested proposals." *Id.*; *see also Savantage Financial Services, supra,* 81 Fed.Cl. at 306. The requirement to establish an "economic interest" is met in the pre-award context by alleging "a non-trivial competitive injury which can be redressed by judicial relief." *Weeks Marine, supra,* 575 F.3d at 1361-62; *Allied Materials & Equip. Co. v. United States,* 81 Fed.Cl. 448, 456 (2008); *WinStar Communications, Inc. v. United States,* 41 Fed.Cl. 748, 763 (1998).

In the *Savantage Financial Services* case, Savantage protested the Department of Homeland Security's ("DHS") issuance of a solicitation, restricted to contractors with Enterprise Acquisition Gateway for Leading-Edge Solutions ("EAGLE") IDIQ contracts, that required offerors to propose the Oracle financial management software system based on a "Brand Name Justification" in which the DHS determined that only the Oracle system and the SAP financial management system would be the baseline for DHS's Transformation and Systems Consolidation ("TASC") initiative to migrate all 22 DHS components to a single system. Savantage's financial management system was being used by six DHS components.

The Court held that it had jurisdiction over Savantage's protest, which alleged a violation of statute or regulation in connection with a procurement, because it determined that the DHS's decision to migrate the entire agency to the Oracle and SAP systems, via the "Brand Name Justification," was a "procurement" as that term is defined by Congress. *Savantage Financial Services, supra,* 81 Fed.Cl. at 304, citing 41 U.S.C. § 403(2) (2008) ("procurement" encompasses "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout"). The Court soundly rejected the Defendant's argument that the "Brand Name Justification" was an agency standardization decision, rather than a procurement, and as such could not be challenged under the Court's bid protest jurisdiction. *Id.* at 304-05. The Court also rejected the Defendant's argument that Savantage lacked standing because it did not have an EAGLE contract and was not an actual or prospective offeror on DHS's solicitation. Finding that Savantage was protesting the DHS's underlying decision to use Oracle and SAP software systems as the baseline for the TASC initiative and that Savantage supplied a competitive financial management system, the Court held that Savantage was an interested party with standing to protest the DHS's sole-source selection of the Oracle and SAP systems. *Id.* at 306. The Court ultimately decided that the sole-source procurement was improper and contrary to law, and the DHS was enjoined from proceeding with the procurement until the DHS conducted a competitive procurement for the selection of a financial management software system. *Id.* at 307-08, 309 and 311.

In *CCL Inc. v. United States,* the Court held that the ADRA (28 USC § 1491(b)) conferred jurisdiction to review a protest which challenged an agency's decision not to conduct a procurement to obtain certain services, but instead to obtain those services by modifying an

existing contract.  39 Fed. Cl. at 789.  The plaintiff in *CCL* was awarded an indefinite

quantity/indefinite delivery contract to provide computer maintenance services at an Air Force

facility in Denver for five years, including option years.  Two years later, the Air Force decided

not to renew CCL's contract.  Instead, the Air Force issued a task order to a different firm, BDM,

to obtain the services previously performed by CCL.  CCL protested the decision to modify the

BDM contract, arguing that the Air Force had violated CICA.  Before granting injunctive relief

for the protester, the court first held that it had jurisdiction to hear the case, despite the absence

of a solicitation or the submission of proposals:  "The new language permits both a suit

challenging government action which is self-consciously a competitive procurement as well as

what CCL is claiming here:  that [the government] is procuring goods and services through a

process that should have been the subject of competition; and that the failure to compete the

procurement is in violation of law.  The statute is therefore plainly invoked. "  *CCL, supra*, 39

Fed. Cl. at 789.

In a CICA case, failure to submit a proposal for the original contract is not fatal to

standing.  *See CW Gov't Travel v. United States*, 61 Fed. Cl. 559, 570 (2004); *Northrop

Grumman Corp. v. United States*, 50 Fed. Cl. 443, 456 (2001); *CCL*, 39 Fed. Cl. at 790.  In *CW

Gov't Travel*, *CCL*, and *Northrop Grumman*, the plaintiff had not bid on the original contract, yet

the court found that the plaintiff had standing.  The court in *CCL* explained that:

> CCL did have a connection with the procurement.  The
> work that it contends should have been competed was work
> that it wanted to do.  Not only has CCL stated it would
> likely have submitted a proposal, but it was performing the
> very work that it alleges DISA illegally diverted to BDM.
> By not being able to compete, it potentially lost a contract.
> As the court held in *ATA Defense Industries v. United
> States*, 38 Fed. Cl. 489, 495 (1997), judicial review of
> procurement methods should not be thwarted through the

> wooden application of standing requirements.  CCL has
> standing.

*CCL*, 39 Fed. Cl. at 790.

Like the plaintiffs in the *Savantage* and *CCL* cases, Plaintiffs here are protesting DOI's improper sole-source procurement, via the "Limited Source Justification," of the Microsoft BPOS-Federal messaging solution and the DOI's failure to conduct a competitive procurement for the selection of a messaging solution that satisfies DOI's minimum needs.  Plaintiffs have standing because Google licenses its competitive messaging solution, Google Apps Premier and Google Apps for Government, to customers either directly or indirectly, and Onix sells licenses for those Google products to governmental and commercial customers.  Moreover, Google's solution can meet or exceed all of DOI's legitimate minimum needs at a cost that is tens of millions of dollars lower than DOI's budget ceiling for the BPOS-Federal solution of $59.3 million, which ceiling is based on the cost to DOI of the Microsoft BPOS-Federal solution. Google and Onix would be actual or prospective offerors on a competitive procurement for the selection of a messaging solution, and the Google Apps solution would be offered either by Google directly or through any one or more of its licensed resellers, including Onix.

**VI.**     **Standards for Injunctive Relief**

In order to obtain a preliminary injunction, Plaintiffs must demonstrate: (i) Plaintiffs' likelihood of success on the merits; (ii) irreparable injury to Plaintiffs if Defendant is not enjoined; (iii) that the harm to Plaintiffs outweighs the harm to Defendant; and (iv) that the public interest is served by enjoining Defendant. *FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed. Cir. 1993); s*ee Delbert Wheeler Constr., Inc. v. United States*, 39 Fed. Cl. 239, 251 (1997), *aff'd*, 155 F.3d 566 (Fed. Cir. 1998).  No one factor is dispositive to the court's inquiry as "the weakness of the showing regarding one factor may be overborne by the strength of the others."

*FMC Corp. v. United States*, 3 F.3d at 427; *see also PGBA, LLC v. United States,* 57 Fed. Cl.

655, 656-57 (2003). Finally, because injunctive relief is relatively drastic in nature, a plaintiff

must demonstrate that its right to such relief is clear. *See Banknote Corp. of America, Inc.,* 56

Fed.Cl. 377, 380-81 (2003), *aff'd*, 365 F.3d 1345 (Fed.Cir. 2004); *Seattle Sec. Servs., Inc. v.*

*United States.*, 45 Fed. Cl. 560, 566 (2000).

        A.    <u>Likelihood of Success on the Merits</u>

        Initially, the court must determine whether it is likely that it would overturn the decision

to select a messaging solution without competition as arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law.  28 U.S.C. § 1491(b)(4).  Regarding the

latter standard, which is drawn from the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), the

Supreme Court has stated:

> Section 706(2)(A) requires a finding that the actual choice made
> was not 'arbitrary, capricious, an abuse of discretion, or otherwise
> not in accordance with law.'  To make this finding the court must
> consider whether the decision was based on a consideration of the
> relevant factors and whether there has been a clear error of
> judgment.  Although this inquiry into the facts is to be searching
> and careful, the ultimate standard of review is a narrow one.  The
> court is not empowered to substitute its judgment for that of the
> agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other*

*grounds by Califano v. Sanders*, 430 U.S. 99 (1977) (citations omitted); *see also Advanced Data*

*Concepts, Inc. v. United States*, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000); *Overstreet Elec. Co. v.*

*United States,* 47 Fed. Cl. 728, 731 (2000).

        The Supreme Court amplified these requirements in *Motor Vehicle Mfrs. Ass'n of the*

*United States v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29 (1983), identifying four

grounds upon which a holding of arbitrary and capricious agency action could be based:

> [I]f the agency has relied on factors which Congress has not
> intended it to consider, entirely failed to consider an important
> aspect of the problem, offered an explanation for its decision that
> runs counter to the evidence before the agency, or is so implausible
> that it could not be ascribed to a difference in view or the product
> of agency expertise.

*Id.* at 43; *see also OMV Med., Inc. v. United States,* 219 F.3d 1337, 1343 (Fed. Cir. 2000);

*CIGNA Gov't Servs., LLC v. United States*, 70 Fed. Cl. 100, 110 (2006); <u>PGBA</u>, *supra,* 57 Fed.

Cl. at 657.  The same review standards apply in the context of a sole-source award.  *Emery*

*Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1086 (Fed. Cir. 2001).  According to the

court in *Emery Worldwide,* to meet the burden of showing that a sole-source award lacks a

rational basis, a party can show:

> (1) the agency's decision to conduct a sole-source procurement
> process lacked a rational basis; (2) the agency's sole-source
> requirements lacked a rational basis; or (3) based on the sole-
> source requirements, the selection of the sole-source awardee
> lacked a rational basis.  The test for reviewing courts is to
> determine whether the contracting agency provided a coherent and
> reasonable explanation of its exercise of discretion.  *See Burlington*
> *Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9
> L.Ed.2d 207 (1962) (indicating that an agency must articulate a
> "rational connection between the facts found and the choice
> made"); *Impresa*, 238 F.3d at 1332.

*Id.*

DOI's "Limited Source Justification" ("Justification") constitutes a sole-source award

and, as such, DOI's explanations for its stated minimum needs and its determination that only the

Microsoft BPOS-Federal messaging solution can satisfy those minimum needs are reviewable

under the rational-basis standard.

1.    The "Limited Source Justification" Lacked A Rational Basis

a.    The Justification Did Not Comply With FAR 8.405-6(a)(2)

DOI's Justification was issued pursuant to FAR 8.405-6(a)(2), which provides that orders placed under Federal Supply Schedules are exempt from the competition requirements in Part 6 except that an ordering activity must justify its action when constricting consideration:

> To an item peculiar to one manufacturer (e.g., a particular brand name, product, or a feature of a product peculiar to one manufacturer). A brand name item, whether available on one or more schedule contracts, is an item peculiar to one manufacturer. Brand name specifications shall not be used unless the particular brand name, product, or feature is essential to the Government's requirements, and market research indicates other companies' similar products, or products lacking the particular feature, do not meet, or cannot be modified to meet, the agency's needs.

Subsection (c) requires that ordering activities may only procure such requirements if the need to do so is justified in writing and approved at the specified levels in subsections (f) and (h) of FAR 8.405-6. Subsection (g)(2) specifies the minimum information required to be included in a limited source justification. DOI's "Limited Source Justification" followed the informational format requirements set forth at FAR 8.405-6(g)(2)(i)-(x).

As stated in the Factual Background section above, the Justification stated that two features of the Microsoft BPOS-Federal suite (consisting of hosting services, Exchange Online, SharePoint Online, and Office Communications Online) were critical to DOI's transition from a disparate email message system to a consolidated and secure system. Those two features were (1) a unified and consolidated email system, and (2) enhanced security.

As demonstrated in Google's June 17, 2010 letter to DOI, Google's messaging solution can meet or exceed the DOI requirements outlined in DOI's May 27 letter and, thus, Google is fully capable of providing DOI with "a unified and consolidated email system." Regarding the "enhanced security" feature, the Justification identified five "attributes of a cloud computing

deployment [to] meet DOI's requirements for the implementation of an enterprise email and

collaboration system" based on an alleged "assessment process" recommended by the Cloud

Security Alliance ("CSA"). The ability to comply with FISMA security requirements was one of

those attributes, and a data storage and computing infrastructure "that is solely dedicated (both

physically and logically [sic] to DOI or to DOI and other Federal government customers only"

were two other key attributes. Simply put, and based on the alleged CSA-recommended

assessment process conducted by DOI, the "enhanced security" critical feature could only be met

with a data storage and computing infrastructure that is either dedicated solely to DOI, *i.e.*, a

private cloud, or to DOI and other Federal government customers only, *i.e.*, a federal-

government-only community cloud.

　　　The Google Apps for Government solution that Google offers, and which is the <u>only</u>

cloud computing solution that is FISMA certified, resides and operates in a government-only

cloud consisting of Federal, State and local government customers. DOI's Justification does not

explain, and DOI's representatives with whom Google had contact have never explained, why a

community cloud that includes State and local government customers is any less secure than a

cloud that includes several Federal government customers. Moreover, in response to one

question raised in DOI's May 27, 2010 letter to Google, the attachment to Google's June 17 letter

stated as follows:

> **DOI Requirement 4: Ability to provide an underlying**
> **infrastructure that is operated solely for DOI**
>
> *Google Response: Yes. The service for DOI can be isolated to a*
> *single domain run on a logically separate network. Further*
> *Google can run service for DOI in a dedicated cloud run for U.S.*
> *Government customers only.*

*See* Exhibit B attached to Plaintiff's Complaint.  DOI's Justification completely ignored

Google's response, which as part of DOI's "market research" demonstrated that Google has a

similar product that meets, or can be modified to meet, DOI's needs, and the Justification

therefore did not comply with the requirements of FAR 8.405-6(a)(2), cited above.

> b. <u>DOI's Alleged Need For A Federal-Government-Only Cloud For
> Hosting Its Messaging Solution Is Not Rationally Based</u>

DOI's justification for a federal-government-only cloud is its alleged "risk assessment"

conducted pursuant to an approach recommended by the Cloud Security Alliance ("CSA").

Google contends that the assessment process followed by DOI as described in the Justification is

incomplete and that the conclusions reached by DOI are not supported by mandatory Federal

information security guidance issued by the National Institute of Standards and Technology

("NIST").  Google's position is based upon the following facts and observations:

1. The DOI does not justify why only a cloud-computing deployment would satisfy
   its objectives for a unified and consolidated e-mail system and enhanced security.
   Specifically, the DOI does not explain why a "traditional" hosting architecture by
   a third-party provider or an on-premise solution would not meet the minimum
   requirements listed in Section 3 of the Justification.

2. The DOI bases what it considers to be the required cloud-computing deployment
   attributes on an assessment process that is not consistent with NIST guidance on
   risk assessments (*i.e.*, NIST Standard Publication (SP) 800-30 *Risk Management
   Guide for Information Technology Systems* (2002) and NIST SP 800-37 Rev. 1
   *Guide for Applying the Risk Management Framework to Federal Information
   Systems: A Security Life Cycle Approach* (2010)) and security control selection
   (i.e., FIPS 199 *Standards for Security Categorization of Federal Information and
   Information Systems* (2004), FIPS 200 *Minimum Security Requirements for
   Federal Information and Information Systems* (2006); NIST SP 800-60 *Rev. 1
   Guide for Mapping Types of Information and Information Systems to Security
   Categories: (2 Volumes) - Volume 1: Guide Volume 2: Appendices* (2008); and
   NIST SP 800-53 Rev.3 *Recommended Security Controls for Federal Information
   Systems and Organizations* (2010).

   While the CSA may generally inform parties interested in cloud deployments on
   cloud-specific risk considerations, it does not provide an assessment process for
   Federal agencies to determine minimum control requirements.  Agencies are

required to use FIPS 199, FIPS 200, and SP 800-53 for decisions on security control requirements.

3.  The DOI improperly applied the CSA guidance to determine security control requirements. Although the DOI does not cite in the Justification the source of the CSA assessment process that was used, Google assumes the DOI is referring to the Cloud Security Alliance Guidance Version 2.1 (2009) ("CSA Guidance") available at www.cloudsecurityalliance.org/guidance/csaguide.v2.1.pdf., which was referenced in the RFQ's SOW.

The CSA Guidance was not designed to be used in the manner described by the DOI in the Justification. The CSA Guidance states on page 2 that it "...*may be used solely for personal, informational, non-commercial use*." Furthermore, the CSA states on page 7 of the document that: "*Our goal in this Guidance isn't to tell you exactly what, where, or how to move into the cloud, but to provide you with practical recommendations and key questions to make that transition as securely as possible, on your own terms.*" The guide also states that the framework "*... is **not** a full risk assessment framework, nor a methodology for determining all your security requirements. It's a quick method for evaluating your tolerance for moving an asset to various cloud computing models.*"

4.  Mandatory Federal information system security guidance does not support the conclusions of the DOI's assessment process described in the Justification. Title III of the E-Government Act, entitled the Federal Information Security Management Act (FISMA), emphasizes the need for organizations to develop, document, and implement an organization-wide program to provide security for the information systems that support its operations and assets. In accordance with the provisions of FISMA, the Secretary of Commerce, on the basis of standards and guidelines developed by NIST, prescribes standards and guidelines pertaining to Federal information systems. Standards prescribed include information security standards that provide minimum information security requirements and are otherwise necessary to improve the security of Federal information and information systems. Federal Information Processing Standards (FIPS) are approved by the Secretary of Commerce and issued by NIST in accordance with FISMA. FIPS are compulsory and binding for Federal agencies. FISMA requires that Federal agencies comply with these standards, and therefore, agencies may not waive their use. Special Publications (SPs) are developed and issued by NIST as recommendations and guidance documents. For other than national security programs and systems, Federal agencies must follow those NIST Special Publications mandated in a Federal Information Processing Standard. FIPS 200 mandates the use of Special Publication 800-53, as amended.

FIPS 199 (also compulsory) outlines the security categorization process Federal agencies such as the DOI should employ to select the appropriate security baselines described in FIPS 200 and NIST SP 800-53. The mandatory security categorization process yields a determination whether a low, moderate, or high security baseline should be selected for an information system. The security

baselines' corresponding minimum recommended security controls are documented in NIST 800-53. Although the DOI does not describe the results of its mandatory FIPS 199 security categorization in its justification, even the "High" security baseline described in NIST 800-53A does not include requirements for the "needed" attributes described in Section 4 of the Justification.

Thus, the determination by DOI to require the cloud deployment attributes specified in the Justification does not appear to be based on an assessment process conducted in accordance with NIST (as required by FISMA), is not supported by CSA Guidance, and the assessment process used does not consider non-cloud solutions that could meet DOI's requirements outlined in the Justification.[9] NIST does allow agencies to select additional controls as deemed necessary; however, DOI has not demonstrated in the Justification how the impact of loss of confidentiality, integrity, and availability for the type(s) of information expected to be contained in the enterprise email and collaboration system would require unique control selections that exceed the highest security baseline recommended by NIST.

Another substantial flaw in DOI's Justification is that it fails to explain why a federal-government-only cloud, which by definition is a "community cloud" and not – as DOI apparently believes – a "private cloud,"[10] is more secure than another community cloud, such as the government-only (Federal, state and local) cloud in which Google's messaging solution is hosted. Moreover, as addressed below, it appears that the BPOS-Federal solution is <u>not</u> hosted in a Federal-government-only cloud.

---

[9] Indeed, the CSA Guidance advises that "Cloud Computing isn't necessarily more or less secure than your current environment."

[10] NIST defines a "Community Cloud" as follows: "The cloud infrastructure is shared by several organizations and supports a specific community that has shared concerns (e.g., mission, security requirements, policy, and compliance considerations). It may be managed by the organizations or a third party and may exist on premise or off premise" *The NIST Definition of Cloud Computing, Authors: Peter Mell and Tim Grance Version 15, 10-7-09* <u>http://csrc.nist.gov/groups/SNS/cloud-computing/</u>

In summary, Google contends that the entire foundation of DOI's determination that it needs a federal-government-only cloud for hosting its messaging solution is fundamentally flawed and lacks any rational basis. It is readily apparent that DOI first chose the BPOS-Federal solution without the benefit of competition, and then backed into its "minimum needs" to supposedly match the BPOS-Federal features (which in fact, as discussed below, they do not). Notwithstanding its alleged "extensive market research," DOI clearly gave no meaningful consideration to Google Apps, which is a proven, Microsoft-compatible solution that offers significant technical and cost-saving benefits and is the only cloud computing solution that is FISMA-certified. Consequently, the Court can only conclude that DOI's Justification premised upon its purported need for a federal-government-only cloud for hosting its messaging solution lacks a rational basis.

c.    <u>Microsoft BPOS-Federal Does Not Meet DOI's Asserted Needs</u>

Even though the DOI mirrored its SOW around the Microsoft product literature, the BPOS-Federal product still does not even meet the agency's requirements. DOI overlooks the inconsistencies and, for the allegedly vital security requirements, DOI actually wrote its SOW on the basis of developing BPOS-Federal into a system that will possibly – someday – meet DOI's alleged "needs," particularly the vital FISMA certification and accreditation.

The Justification emphasizes that DOI requires a system with a "computing infrastructure [and a data storage infrastructure] that is solely dedicated (both physically and logically) to DOI or to DOI and other Federal government customers only." DOI goes on to state that it needs a "private cloud model." However, in direct contradiction to this stated need, Microsoft's own literature describes BPOS-Federal as a community-cloud, sharing infrastructure among Federal government customers, contractors, commercial companies, and others:

> This document describes the features or improvements in the
> BPOS-F offering that are incremental to the BPOS-Dedicated
> offering. The features under this offering are intended to assist US
> Federal government agencies and commercial companies subject
> to the ITAR (International Traffic in Arms Regulations) regulation.

Microsoft Online Services: What's New in the BPOS-Federal offer, April 2010, Introduction, p. 4

(emphasis added); *see also* Federal Solutions Service Description, October 2010, Introduction, p.

4.[11]  The Microsoft press release regarding BPOS-Federal similarly provides:

> Business Productivity Online Suite Federal is launching today for
> U.S. federal government agencies, related government contractors
> and others that require the highest levels of security features and
> protocols.

"Microsoft Unveils New Government Cloud Offerings at Eighth Annual Public Sector CIO

Summit," Microsoft News Center, Feb. 24, 2010,[12] (emphasis added).

This information reveals several glaring inconsistencies.  First, as mentioned in the

preceding section, the NIST definition of a private cloud, conveniently included for some reason

in the SOW, is a "cloud infrastructure [that] is operated solely for an organization."  The

Justification's requirement for an infrastructure shared among DOI and other federal agencies is

not for a private cloud; rather, the requirement refers to a community cloud, not unlike the

community cloud in which Google Apps is hosted.  Comparatively, BPOS-Federal is hosted in a

community cloud as well, sharing its infrastructure among various commercial and federal

entities.

---

[11]  The April 2010 version, and not the October 2010 version, of Microsoft's product description, quoted above, was
the version available when DOI executed its Justification.  Nevertheless, there does not appear to have been any
relevant change because the current description also contemplates a computing infrastructure that is shared with
commercial companies.  The current description is available at
http://www.microsoft.com/downloads/en/details.aspx?FamilyID=1290dbcb-2eed-441a-a5c0-f15f9647be6b]

[12]  *See* http://www.microsoft.com/presspass/press/2010/feb10/02-24ciosummitpr.mspx

Most importantly, since BPOS-Federal shares its cloud with government contractors, commercial entities, and others, it is clear that it does not satisfy the stated "needs" that the storage and computing infrastructures be operated solely for the DOI or other Federal government agencies.  It was this very requirement that improperly precluded Google from competing because Google Apps shares its infrastructure among Federal, State and local governments.  BPOS-Federal is even more non-compliant with the very same "need."  Google Apps for Government limits the data stored in its cloud to government (Federal, state and local) entities <u>only</u> whereas Microsoft states in its literature that the BPOS-Federal solution is available to non-Government entities such as commercial companies, including government contractors, and others.

The inability of BPOS-Federal to meet DOI's infrastructure requirements is further demonstrated in the fact that BPOS-Federal relies on a managed network and management network.  The customer data would reside in the managed network with a shared physical infrastructure, whereas the Microsoft management network provides services to all customers and is not dedicated.

In other allegedly vital areas, DOI excuses or ignores the inadequacies of the Microsoft product.  This is best exemplified by the fact that BPOS-Federal has no FISMA certification, and there are other existing solutions available that are so certified, such as Google Apps.  The Justification and SOW both stress the underlying critical need for security:

> Underlying all of the requirements described above is the need for DOI to meet the obligation to secure the messaging and collaboration system in compliance with the Federal Information Systems Management Act…

However, as described above, DOI allows Microsoft and its reseller to work together on obtaining a FISMA certification after contract award.  No specific timeline is in place to

implement the FISMA certification and in the meantime, the DOI must settle for SAS-70 reports. *See* SOW § 10.5.7.

As another example, DOI requires that offerors propose Microsoft Live Meeting, as evidenced in the RFQ pricing schedule, line items 15 – 20, but this product is not included in the Microsoft BPOS-Federal infrastructure.  The Microsoft BPOS-Federal literature provides:

> This service description does not apply to the following products:
> Microsoft Office Live Meeting
>
> Microsoft Office Live Meeting incorporates a separate set of
> security and compliance features and configuration options that
> customers can review for applicability to their specific
> requirements.

Microsoft Online Services: What's New in the BPOS-Federal offer, April 2010, Introduction, p. 4; *see also* Federal Solutions Service Description, October 2010, Introduction, p. 4.

The Microsoft Exchange Online Service Description explains that Live Meeting is hosted from a separate infrastructure, presumably one that is not limited to DOI or Federal entities:

> Microsoft Office Live Meeting Service Description
> Office Live Meeting is an enterprise-class Web conferencing
> service. With Office Live Meeting, organizations can engage
> customers through real-time meetings, training sessions, and
> events presented over the Internet. Office Live Meeting operates
> on an infrastructure separate from Microsoft Online Services.
> However, Microsoft Online Services provides consulting services
> to help organizations efficiently adopt and begin using the Office
> Live Meeting service.

Microsoft Online Services: Exchange Online Dedicated Services Description, April 2010, p. 35 (emphasis added); *see also* Federal Solutions Service Description, October 2010, p. 34.

Similarly, archiving requirements are hosted from a separate infrastructure – one that is not even operated by Microsoft.  Section 4.1.4 of the SOW sets forth the requirements for

message archiving that must be part of the proposed BPOS-Federal solution. The Microsoft

Exchange Online Service Description, however, explains that:

> The Exchange Online e-mail archiving feature automatically
> captures internal and external communications that flow through
> Exchange Online, and then stores them in encrypted form at a
> separate archiving data center operated by a Microsoft partner.

Microsoft Online Services: Exchange Online Dedicated Services Description, April 2010, p. 25

(emphasis added); *see also* Federal Solutions Service Description, October 2010, p. 26.

The foregoing facts demonstrate that DOI selected an unproven messaging solution,

which is allegedly the only commercial product that satisfies the DOI's purported "minimum

needs," and wrote an SOW that parrots Microsoft's product literature, but fails to recognize that

the selected product does not even satisfy the stated requirements. DOI's Justification, setting

forth its sole-source requirements, clearly does not pass muster. It does not acknowledge that a

similar product, Google Apps, meets or can be modified to meet DOI's stated needs; it does not

reasonably or rationally support the determination that the need for enhanced security can only

be met by hosting the messaging solution in a federal-government-only cloud; and the selection

of the Microsoft BPOS-Federal solution lacked a rational basis because the Microsoft product

does not meet DOI's stated needs. Finally, the fact that Google Apps for Government is FISMA-

certified, and BPOS-Federal is not, underscores the irrationality of DOI's misguided

determination that only the BPOS-Federal solution can satisfy DOI's minimum needs and that

only a federal-government-only cloud will provide the "enhanced security" that DOI requires.

Accordingly, Plaintiffs are likely to succeed on the merits of their protest.

B.     Irreparable Injury To Plaintiffs

As noted earlier, the RFQ contemplates an award for a maximum five-year period that

could be worth as much as $59.3 million. When assessing irreparable injury, "[t]he relevant

inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction." *Magellan Corp. v. United States,* 27 Fed. Cl. 446, 447 (1993). This Court has acknowledged that a lost opportunity to compete may constitute an irreparable harm. *PGBA LLC, supra,* 57 Fed. Cl. at 664 ("This court has acknowledged that a lost opportunity to compete may constitute an irreparable harm . . . ."); *Overstreet Elec. Co., supra,* 47 Fed. Cl. at 744; *Seattle Sec. Servs., Inc., supra,* 45 Fed. Cl. at 571 (2000). The Court's failure to issue a preliminary injunction will result in a severe competitive disadvantage to Plaintiffs by denying them the opportunity to compete for this significant opportunity to provide a secure, consolidated messaging solution for DOI. Were DOI directed to conduct a competitive procurement for its messaging solution, Google would submit an offer, either directly or through a licensed reseller. Loss of this opportunity is not compensable by money damages because there is no meaningful way to measure the value of such a loss.

C.   Balance of Hardships

Under this factor, the court must consider whether the balance of hardships leans in the plaintiff's favor. This requires a consideration of the harm to the government. In considering a bid protest, the court is also required to "give due regard to the interests of national defense and national security . . . ." 28 U.S.C. § 1491(b)(3). It is not sufficient for DOI to simply make an assertion of an interest in national defense and national security. Such an assertion must be subject to the same analysis as other allegations. *Gentex Corp. v. United States,* 58 Fed. Cl. 634, 655 (2003) ("While the Court certainly must give serious consideration to national defense concerns and arguably should err on the side of caution when such vital interests are at stake, allegations involving national security must be evaluated with the same analytical rigor as other allegations of potential harm to parties or to the public."). In Plaintiffs' view, no such national defense and security concerns affect the Court's analysis.

As stated above, the harm to Plaintiffs is the loss of a significant opportunity to compete for DOI's messaging solution requirements.  Google Apps is a proven, Microsoft-compatible, secure messaging solution that offers considerable technical and cost-savings benefits to Federal agencies, such as DOI.  Plaintiffs should not be deprived of the opportunity to compete, and thus lose substantial business, on the basis of a flawed and irrational sole-source selection of the Microsoft BPOS-Federal solution.

Weighing against the injury to Plaintiffs, DOI's bureaus and offices are currently operating with their existing messaging solutions.  DOI has issued an RFQ with multiple deficiencies and restricting the offers to the Microsoft BPOS-Federal solution that, as demonstrated above, does not even satisfy DOI's stated, but unfounded, minimum needs.  DOI would lose little and actually gain much by canceling the RFQ and conducting a competition for a messaging solution that will meet or exceed DOI's legitimate minimum needs and represent the best value to the Government.  A balancing of hardships weighs strongly in favor of Plaintiffs.

D.    Public Interest

The public interest will be served by granting the requested preliminary injunctive relief. "Clearly, the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." *PGBA, supra,* 57 Fed. Cl. at 663; *see also Rotech Healthcare, Inc. v. United States,* 71 Fed. Cl. 393, 430 (2006); *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 266, 269 (1997); *Magellan Corp., supra,* 27 Fed. Cl. at 448.  "The public interest will be served by preserving the Court's ability to fashion relief should it ultimately determine an illegality occurred.  There is an overriding public interest in preserving the integrity of the procurement process." *Advanced Systems Technology, Inc. v. United States,* 69 Fed. Cl. 474, 486 (2006); s*ee Cincom Sys., Inc. v. United States,* 37 Fed. Cl. 266, 269 (1997) (*citing Magellan Corp.*, 27 Fed. Cl. at 448).

In the instant case, the public's interest likewise lies in preserving the integrity of the competitive process – such, indeed, clearly was Congress' view in providing that, except in circumstances not yet demonstrated here, DOI must comply with the requirements of 41 U.S.C. 253(a), "in conducting procurement for property or services" to "obtain full and open competition."  Granting injunctive relief will also preserve this Court's ability to fashion appropriate relief upon final determination that illegality has occurred.  The integrity of the competitive process is challenged in this case in the most pernicious way, a surreptitious attempt to totally avoid the constraints of CICA and the related provisions of the FAR.

Finally, in these challenging economic times, DOI's failure to meaningfully consider Google's substantially-less expensive solution that will more than satisfy DOI's legitimate minimum needs is an affront to the taxpayer and ignores the public interest.  For all of these reasons, the public interest will be served by the issuance of injunctive relief.

**VII.   Conclusion**

Plaintiffs respectfully request this Court to issue a temporary restraining order and preliminary

and permanent injunctive relief prohibiting the Defendant from proceeding in any manner with

the RFQ, or any related procurement, solicitation, task order or activity (such as DOI's current

5,000-user pilot program) that furthers or facilitates the implementation of the Microsoft BPOS-

Federal solution at DOI, pending final disposition of Plaintiffs' Complaint in this matter.


Respectfully submitted,


Timothy Sullivan
1909 K Street, N.W., 6th Floor
Washington, D.C.  20006
(202) 585-6930 (tel.)
(202) 508-1028 (fax)

Attorney of Record  for Plaintiffs Google, Inc.
and Onix Networking Corporation

Of Counsel:

Katherine S. Nucci
Scott F. Lane
Thompson Coburn LLP

Dated:  October 29, 2010

CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2010, I caused two copies of the Plaintiffs'

Memorandum Of Points And Authorities In Support Of Plaintiffs' Application For Temporary

Restraining Order And Motion For Preliminary And Permanent Injunctive Relief to be served

by hand delivery upon:

        Christopher L. Krafchek
        U.S. Department of Justice
        Commercial Litigation Branch
        8th Floor
        1100 L Street, N.W.
        Washington, D.C.  20530

Timothy Sullivan