# In the United States Court of Federal Claims

No. 10-743C
Filed: January 4, 2011[1]
**TO BE PUBLISHED**

************************************************

| | |
|---|---|
| * | Administrative Procedure Act, 5 U.S.C. |
| GOOGLE, INC., * | § 706(2)(A); |
| * | Administrative Record; |
| and * | Bid Protest; |
| * | Competition in Contracting Act, 41 |
| ONIX NETWORKING CORPORATION, * | U.S.C. § 253(a); |
| * | Federal Acquisition Regulations |
| Plaintiffs, * | 6.302-1(a), 6.303-1, 6.303-2, 6.304; |
| * | Intervenor Standing, RCFC 24(a)(2); |
| v. * | Judgment on the Administrative |
| * | Record, RCFC 52.1(c); |
| THE UNITED STATES, * | Plaintiff Standing; |
| * | Preliminary Injunction, RCFC 65(a); |
| Defendant, * | Tucker Act, 28 U.S.C. § 1491(b)(4). |
| * | |
| and * | |
| * | |
| SOFTCHOICE CORPORATION, * | |
| * | |
| Defendant-Intervenor. * | |
| * | |

************************************************

**Timothy Sullivan**, Thompson Coburn, LLP, Washington D.C., Counsel for Plaintiff.

**Christopher L. Krafchek**, United States Department of Justice, Commercial Litigation Division, Washington, D.C., Counsel for Defendant.

**Steven J. Rosenbaum,** Covington & Burling, LLP, Washington, D.C., and **William A. Shook**, Shook, Doran, Koehl LLP, Washington, D.C., Counsel for Defendant-Intervenor.

**MEMORANDUM OPINION AND ORDER**
**ISSUING A PRELIMINARY INJUNCTION[2]**

---

[1] This Memorandum Opinion And Order Issuing A Preliminary Injunction originally was filed under seal on December January 3, 2011.  All redactions are denoted with brackets.

[2] The facts cited herein were derived from the Administrative Record ("AR"), filed on November 5, 2010, as corrected by the Defendant on November 29, 2010 and December 21, 2010 ("AR 1-1616").

**BRADEN,** *Judge.*

On October 29, 2010, Google, Inc. and Onix Networking Corporation, a licensed vendor of Google products and solutions (hereinafter collectively "Google"), filed a pre-award bid protest in the United States Court of Federal Claims, challenging an August 30, 2010 Request for Quotation No. 503786 (the "RFQ") by the Department of the Interior ("Interior" or "DOI") to provide "hosted email and collaboration services and [Interior's] supporting 'Limited Source Justification.'" Compl. ¶ 1-2. After reviewing the Administrative Record from November 5, 2010 and updated through December 21, 2010, Google filed an Amended Complaint on December 30, 2010 to challenge the entire procurement, including a June 10, 2010 Modification No. 0003 to an existing contract with Dell Marketing ("Dell") to implement a pilot project to migrate the Bureau of Indian Affairs email systems to Microsoft Exchange and two July 15, 2010 Standardization "Determination and Findings" to "establish Microsoft's Business Productivity Online Suite–Federal as the Department-side standard for Messaging and Collaboration" and Microsoft Desktop and Service Software, as the "Department-wide standard for computer operating, systems desktop and service, office automation, and systems management software." Am. Compl. ¶¶ 41-48.

For the reasons discussed herein, the court has determined that a preliminary injunction and remand is warranted.

## I.     RELEVANT FACTS OF THE PROCUREMENT AT ISSUE.

On November 16, 2009, Department of Interior's Office of Inspector General issued a FY2009 FISMA Evaluation Report that made the following finding:

> The Department of the Interior (DOI) does not fully comply with the Federal Information Security Management Act (FISMA)[3] again this year. The decentralized organizational structure, fragmented governance processes related to the Information Technology (IT) program, lack of oversight, bureau resistance to Departmental guidance, and use of substantially under-qualified personnel to perform significant information security duties exasperates [sic] the challenges in securing the Department's information and information systems. Personnel responsible for management of the IT Programs are not accountable for results, and existing investments are not leveraged to their full potential. These serious flaws significantly negate the benefit of the $182 million spent on IT security in fiscal year (FY) 2009 and the efforts of the 677 employees and contractors fully devoted to information security across the Department.

AR 1535.

---

[3] Congress enacted Title III of the E-Government Act of 2002 "commonly referred to as FISMA, in response to concern about the security of federal information and information systems." AR 1540.

* * *

We include many recommendations from previous reports to address the deficiencies identified throughout this report. *Until the Department establishes a sound governance structure for its IT program, creates an atmosphere of accountability, and performs adequate oversight, it is unlikely information security will improve.*

AR 1538 (emphasis added);[4] *see also* AR 1347-1492.

The Inspector General's Report provides context to the relevant facts of the procurement at issue.

In June 2002, a Department of the Interior Information Technology Management Reform ("ITMR") study identified areas where the agency's information technology environment needed improvement. AR 1. One area was email/messaging services. AR 1. In August 2002, the Secretary of the Interior issued a Memorandum, titled "Information Technology Resources Management," that established the Information Technology Management Committee ("ITMC") as the "governing body for information technology within [Interior]." AR 1539. In 2003, Interior initiated an Enterprise Messaging Service Initiative ("EMS Project") "to consolidate email into a single [Interior]-wide system[.]" AR 1.

On July 24, 2006, Interior's Chief Information Officer ("CIO") issued an "Email Solution Selection Notice of Record" to announce that "*Microsoft Exchange was chosen as the single consolidated email solution for consistency and interoperability with [Interior] enterprise license purchases and was the result of exhaustive analyses from the EMS [Enterprise Messaging Service] team.*" AR 765 (emphasis in original). On September 28, 2006, the EMS Project was terminated, but the CIO issued policy guidance "for [Interior's] Bureaus and Offices to migrate from their existing email systems to Microsoft Exchange on a bureau-by-bureau basis by the end of FY 2009." AR 1; *see also* AR 751 (listing factors contributing to "the failure of this project").

In late 2007, Interior's Chief Technology Officer ("CTO") began to assess the viability of implementing a single email and collaboration system, known as "Unified Messaging" to replace thirteen existing independent email systems. AR 175. The following entities were contacted to provide market research and/or their analyses of relevant issues: [REDACTED][5], the National

---

[4] The Administrative Record does not include the Department of Interior's Office of Inspector General's FY2010 FISMA Evaluation Report that the court assumed was issued in November 2010.

[5] [REDACTED] is well recognized as one of the leading providers of IT market research and analysis. AR 175.

Institute of Standards and Technology; the Cloud Security Alliance[6]; and the Government Accountability Office.  AR 175.

On April 9, 2008, Interior's CIO, Michael J. Howell, issued an Electronic Mail Interim Guidance and Policy Review that instructed Interior Bureaus and Offices to "continue planning and conversion efforts to migrate to the latest version of Microsoft Exchange 2007 email."  AR 1.  An "[Interior] Email Team" was established, headed by Mr. Bill Corrington, then the Acting CTO, "to make recommendations about email policy direction of the Interior" to be presented to the ITMC.  AR 2.

On June 17, 2009, Mr. David Standish, Google-Federal, requested a meeting with Mr. Corrington to discuss Interior "using MS Outlook with Google Apps for email, contacts, and calendar[.]"  AR 59.  On July 8, 2009, a meeting was held between Mr. Corrington and Mr. Standish to discuss Interior's "goal of implementing a single email system."  AR 150.

On July 31, 2009, Microsoft's Account Manager – Federal, U.S. Public Sector, Ms. Justina Glavin, sent an email to Mr. Corrington and Mr. Andrew Jackson, Deputy Assistant Secretary for Human Capital, Performance, and Partnerships, to follow up on a prior meeting.  AR 1088.  The attachments were described as "BPOS overview for Dept. of Interior," which appear to include 14 documents.[7]  Id.

On September 15, 2009, Mr. Standish forwarded Interior an announcement that Google had an ongoing project to create a Google Apps cloud computing environment dedicated only to government customers, to be operational in 2010, and that Google intended to submit a FISMA Certification and Accreditation package for government approval by the end of the year.  See http://googleenterprise.blogspot.com/2009/09/google-apps-and-government.html (last visited 12/31/2010).

On September 24, 2009, Mr. Corrington sent an email to Microsoft's Vice President, Federal Government, Ms. Teresa Carlson, and Ms. Glavin to acknowledge a prior meeting that

---

[6] The "Cloud Security Alliance" ("CSA") is a non-profit organization with a mission "[t]o promote the use of best practices for providing security assurance with Cloud Computing, and provide education on the uses of Cloud Computing to help secure all other forms of computing."  AR 158 (citing http://www.cloudsecurityalliance.org) (last visited 1/3/2011).  Enclosed in the Administrative Record is a March 2010 CSA document entitled, "Top Threats to Cloud Computing V 1.0" (AR 633-46) that lists Microsoft as a contributor.  AR 637.
"Cloud Computing" has been defined by the United States Government Accountability Office as "an emerging form of computing where users have access to scalable, on-demand capabilities that are provided through Internet-based technologies, [with] the potential to provide information technology services more quickly and at a lower cost, but also to introduce information security risks."  AR 696; see also AR 122 ([REDACTED] defining "cloud computing" as "a style of computing where scalable and elastic IT-related capabilities are provided 'as a service' to customers using Internet technologies").

[7] The Administrative Record does not include these attachments.

also was attended by Deputy Assistant Secretary Jackson and Mr. Sanjeev Bhagowalia, who was now Interior's CIO.  AR 1088.  Mr. Corrington expressed his interest in "continuing to work with the Microsoft team to achieve a *successful project outcome*!"  AR 1088 (emphasis added). [REDACTED].

On October 16, 2009, [REDACTED]'s Vice President wrote a letter to Interior's CIO, Mr. Sanjeev Bhagowalia, confirming that:

> I have reviewed the DOI project document[8] for level of detail, general content sections, and whether the information contained therein will provide sufficient justification for the proposal to consolidate the Department on one email system and move to a hosted model for same.  More granular observations and recommendations are provided in the attached spreadsheet.[9]

> [REDACTED]

AR 181.

On February 4, 2010, apparently at the request of Microsoft, Mr. Steve Ballmer, the Chief Executive Officer, together with Ms. Teresa Carlson, Vice President, Federal Government, and Ms. Justina Glavin, Account Manager–Federal, U.S. Public Sector, met with Interior's Deputy Secretary David Hayes and Deputy Assistant Secretary Jackson.  AR 1045-46.[10]

Later that day, Ms. Carlson sent the following email to Deputy Assistant Secretary Jackson:

> Hi Andrew,

> Thank you for time today and pulling this meeting together with a short turn there to meet with Steve Ballmer there. Microsoft's commitment to these efforts and our broader partnership are truly at every level here, and we certainly felt that

---

[8] The Administrative Record does not identify what "DOI project document" was reviewed, but it may have been AR 1091-1125 (September 28, 2009 unsigned "unified Messaging System Project Plan – estimating "project implementation costs" for FY2009-10 as $[REDACTED] million and "annual operating costs" of $[REDACTED] million for each subsequent fiscal year starting in FY2010).  AR 1110.  The document does not appear to include any "Project Cost Analysis."  AR 1125.

[9] The Administrative Record does not include the attached spreadsheet.

[10] The Administrative Record does not include any documents reflecting the subject discussed at this meeting.

from Interior as well. *As we round the bend on the contract side* to get this effort going, I can assure you that my team gives me daily status on where we are there.

AR 1046-47 (emphasis added).

Deputy Assistant Secretary Jackson responded:

Thanks for your note Teresa, and for stopping by this morning. It was a great opportunity for [Deputy Secretary] David [Hayes] to hear what we are working on together and a fantastic show of support from the highest level of leadership at Microsoft[.]

Warm regards,

Andrew

AR 1046.[11]

On February 6, 2010, Mr. Ballmer sent an email to Deputy Secretary Hayes:

Thank you for taking the time to meet with me. I share your passion around the growing partnership between Microsoft and the Department of the Interior. You have my personal commitment to success on this Exchange Online Project. I agree with you that this effort—*as a first in Federal*—should be celebrated appropriately[.]

Best regards,

Steve

AR 1045-46 (emphasis added).

On February 18, 2010, another meeting took place between representatives from Google and Interior wherein, according to notes taken by Mr. Corrington, Google representatives "stated that no single tenant or 'private cloud' offering[12] would be available for the cloud-based emails services." AR 184. Mr. Corrington responded that a dedicated or "single tenant model was unlikely to meet [Interior's] requirements." AR 184; *see also* AR 150.

---

[11] The Administrative Record does not include attachments to this email, that likely are photo-ops from the meeting.

[12] The National Institute of Standards and Technology defines a "private cloud" as one where "[t]he cloud infrastructure is operated solely for an organization. It may be managed by the organization or a third party and may exist on premise or off premise." AR 437.

On April 20, 2010, British Petroleum's Deepwater Horizon drilling rig exploded, diverting the attention of many of Interior's top executives to address this national crisis.

On April 28, 2010, Interior representatives attended a Google Apps Summit where an overview and introduction to Google Apps was provided to government IT leaders.  AR 97, 150.  [REDACTED].

On May 4, 2010, Interior's CIO, Mr. Sanjeev Bhagowalia, apparently issued a "Unified Messaging System-Project Plan"[13] indicating that 68,256 of the agency's 84,790 mail boxes at the time were delivered via the LOTUS NOTES/DOMINO platform; the remaining were delivered via the Microsoft Outlook/Exchange platform.  AR 1584.  The recipients of this "Project Plan" were not identified.  The primary objective of this "Project Plan" was "to improve the quality of messaging services . . . with 24/7 support at less cost than [Interior] is currently paying."  AR 1584.  When the "planned migrations are complete, more than 80% of [Interior's] mailboxes will be delivered via [Microsoft] Outlook/Exchange."  AR 1584.

This "Proposed Plan" also reported that:

[REDACTED].

AR 1586.

*   *   *

[REDACTED]

**3.2    Project Sponsorship**

[REDACTED]

- **Issuance of Secretarial Order:** A Secretarial Order endorsing the project will be critical to establish the project as a priority for the Secretary and DOI.

---

[13] On December 17, 2010, the Government requested permission to Amend the Administrative Record to include this document, but the copy provided to the court was not signed.  Whether the document was signed or not, the "Procurement Strategy," discussed therein, appears to have been implemented as planned, at least until this bid protest was filed.

### 3.3     Procurement Strategy

[REDACTED]  This approach has been developed in collaboration with DOI's Chief Procurement Executive and Chief of the NBC Acquisition Services Division.  The procurement strategy is as follows:

[REDACTED].

AR 1587.

On May 17, 2010, Google sent a letter to Interior's Chief Acquisition Management Division IV, Ms. Debra Glass, asking whether it was accurate that Interior intended to procure a single agency-wide email system using only specified Microsoft products.  AR 3-6.  On May 27, 2010, Ms. Glass invited Google to make a presentation to support the "prior market research discussions" with Interior representatives.  AR 47.  In addition, Google was sent a set of questions to answer regarding Google's "ability to meet FISMA security certification requirements" and underlying dedicated infrastructure.  AR 47-49.

On May 26, 2010, Interior's CIO, Mr. Sanjeev Bhagowalia, joined the General Services Administration and was replaced by Mr. Bernard J. Mazer, the former CIO of Interior's Fish and Wildlife Service.

On June 9, 2010, Interior requested a meeting to "provide Google with the opportunity to present how Google's service offering could meet [Interior's] business requirements."  AR 184.  At that meeting, Google informed Interior representatives that "elements" of Google's "community cloud offering" would be available in the third quarter of 2010, but no specific elements or dates were provided.  AR 185.  Google admitted, however, that Google's cloud offering was not designed to support a dedicated solution, but argued that a "'community cloud' for all government customers would better suit [Interior's] needs."  AR 185.

On June 14, 2010, Interior issued Amendment Modification 0003 for Contract No. GS35F4072D/NBCF09382, an existing contract with Dell Marketing, LP ("Dell") for the purchase of Microsoft licenses, that expanded the contract to cover "the purchase of Microsoft Business Online Suite (BPOS–Federal) for the Bureau of Indian Affairs."  AR 855.[14]  This contract was referred to as a "pilot project" to migrate 5,000 Bureau mail boxes to Microsoft Exchange.  The total contract amount was revised to $[REDACTED].  AR 855.

---

[14]  The Administrative Record does not include a copy of Contract No. 6535F40720/ NBMF09382, nor the Contracting Officer's determination of how an existing contract with Dell, authorizing the purchase of Microsoft licenses for Outlook and Exchange, could be "modified" to purchase 5,000 mailboxes for the Microsoft Exchange online service "within the scope" of the initial contract with Dell.  AR 1587.  The Administrative Record contains a "Justification for Other than Full and Open Competition," for this modification, signed by Mr. William Corrington in his capacity as Chief Technology Officer.  AR 1003.1-.10.  The copy in the Administrative Record was not signed by the Contracting Officer.  AR 1003.6.

On June 17, 2010, Google's Vice President, Enterprise Sales, Michael Lock, sent Mr. Andrew Jackson, now the Deputy Assistant Secretary for Technology, Information, and Business Services, answers to the questions forwarded to Google on May 27, 2010.  AR 50-54.  On June 18, 2010, Deputy Assistant Secretary Jackson responded "to clarify a misconception noted in [Google's July 17, 2010] letter.  As I stated last week, [Interior] has not finalized its procurement strategy for the planned cloud messaging solution.  We continue to evaluate all options in light of our business requirements."  AR 1034.

On June 23, 2010, Interior's Senior Procurement Analyst and Competition Advocate, Ms. Brigitte Meffert, sent a letter to Mr. David Standish, Google–Federal, to acknowledge receipt of an email and a summary of a June 9, 2010 meeting regarding "the projected [Interior] messaging solution procurement.  Right now, we need to allow the procurement process to progress, and if, at some point, we need to become involved, we will.  We are confident that Google, and all interested parties will be treated fairly during the process."  AR 1033.

In addition, on June 23, 2010, Mr. Standish sent a letter to Deputy Assistant Secretary Jackson to confirm that "all functionality of Google Apps is available today, certifiable under FISMA according to NIST 800-53 security controls at the 'moderate baseline,'" and that Google's government-only cloud was available as well.  AR 1029.  Google also registered continuing concern about "rumors that project deployment activities [were] already underway to migrate [Interior] to a pre-determined messaging solution[.]"  AR 1030.  On the same day, Deputy Assistant Secretary Jackson responded: "I would encourage you to treat rumor and innuendo as just that. . . .  We have of course required our bureaus to commence preparations for a migration to a new messaging system" and these activities will be useful "no matter which messaging provider is ultimately selected."  AR 1027.

On June 24, 2010, Mr. Standish notified Deputy Assistant Secretary Jackson that "our engineering team delivered the government-only cloud ahead of schedule, approximately 8 days in advance of Q3. . . .  The elements of the government-only cloud that are now available are messaging and calendaring, and additional collaboration elements will be added later this year."  AR 1023.

On June 29, 2010, Interior's new CIO, Mr. Mazer, sent a Memorandum, titled "Risk Assessment of Cloud Deployment Models for Department of the Interior Unified Messaging" to the Deputy Assistant Secretary Jackson.  AR 154-68.  Therein, four different cloud deployment models were described that were referenced in the National Institute of Standards and Technology definition of cloud computing:

- *Private cloud.*  The cloud infrastructure is operated solely for an organization.  It may be managed by the organization or a third party and may exist on premise or off premise.
- *Community cloud.*  The cloud infrastructure is shared by several organizations and supports a specific community that has shared concerns (e.g., mission, security requirements, policy, and compliance considerations).  It may be managed by the organizations or a third party and may exist on premise or off premise.

- *Public cloud.* The cloud infrastructure is made available to the general public or a large industry group and is owned by an organization selling cloud services.
- *Hybrid cloud.* The cloud infrastructure is a composition of two or more clouds (private, community, or public) that remain unique but are bound together by standardized or proprietary technology that enables data and application portability (e.g., cloud bursting for load-balancing between clouds).

AR 162 (citing http://csrc.nist.gov/groups/SNS/cloud-computing/cloud-def-v15.doc) (last visited 1/2/2010).

Based on government and commercial analysis of cloud security and risks and Interior's [REDACTED]. AR 164, 166. Following the assessment process recommended by the [REDACTED],[15] the following "attributes" describing Interior's requirements for implementing an enterprise email and collaboration system were identified:

[REDACTED]

AR 168.

On the same date, June 29, 2010, [REDACTED] submitted a report entitled "Email Hosting Market Research" to Interior, conducted during the fourth quarter of 2009 and the first quarter of 2010, to examine "13 firms that provide a messaging and collaboration system," including IBM, Google Apps, and Microsoft. AR 169-70. [REDACTED] advised Interior that [REDACTED]. AR 171. [REDACTED]. AR 171.[16] Therefore, [REDACTED] concluded that [REDACTED]. AR 171.

---

[15] The Administrative Record contains a March 17, 2010 analysis by [REDACTED] that criticizes [REDACTED]. AR 662.

[16] The Administrative Record contains an April 30, 2010 [REDACTED] Report [REDACTED] stating that, "Private cloud computing can be a major investment. Although issues with security and privacy may be real with public cloud computing services, test your assumptions and fully analyze your requirements before you rule out using public cloud computing services. Private cloud computing requires a focus on process issues (operational, management, funding and service description) and people issues (cultural and political) before investments in technology solutions." AR 681; *compare with* AR 1531-75 (Nov. 16, 2009 Interior's Office of Inspector General FY2009 FISMA Evaluation Report); *see also* AR 685 ([REDACTED] further reporting that "[a]s public cloud computer services mature, decisions about developing or expanding private cloud computing architectures will be return-on-investment decisions. Many private cloud computing services will eventually become hybrid services – leveraging enterprise-owned resources and public cloud resources – or will migrate completely to the public cloud. Being proactive by managing this evolution is critical. [REDACTED] believes the private cloud computing hype will peak in 2010, and reality will set in through 2012, as more technologies become available[.]").

On July 13, 2010, an "[Interior] Messaging Solution Acquisition Plan" was apparently issued, as part of an "acquisition package."   AR 765-72.[17]   This document states that the "contract to support [Interior's] Unified Messaging [P]roject will total approximately $[REDACTED] million over a five-year period from contract award through December 31, 2014," per the "BPOS-Federal Services Independent Government Cost Estimate."   AR 766. "[T]his procurement is expected to be the first step in establishing a framework and market model that could result in DOI adding up to 80,000+ DOI Email mailboxes as well as other messaging and collaboration services. . . . The nature of the requirement is such that we must complete the initial phase of the procurement activity (*i.e.*, [Microsoft] BPOS-Federal) by the end of August 2010 to ensure that we meet schedule requirements."   AR 766.   In addition, this document identifies that "Project Management Office (PMO) support to maintain and update the schedule, risk-log, budget, coordinate installation activities with BPOS-Federal, and facilitate planning for mailbox migrations to the BPOS–Federal from their existing Bureaus will [be] provided under a *separate procurement*.   In addition, it is anticipated that [another] *contract will be awarded or existing vehicle leveraged* to assist DOI in the Independent Verification and Validation (IV&V) of the program."   AR 767 (emphasis added).

On July 15, 2010, Interior's CIO, Mr. Mazer requested that the Assistant Secretary-Policy, Management, and Budget, Ms. Rhea S. Suh, approve and sign attached "Determination and Findings" to establish Microsoft's BPOS-Federal as "the Department-wide standard for Messaging and Collaboration."   AR 748-56.   The "Determination and Findings" represented a "number of benefits" to be achieved from the standardization.   AR 749-56.   In addition, referenced therein was a June 29, 2010 summary of an internal "risk assessment" (AR 154-68) stating that Interior's "current requirements for the implementation of an enterprise email and collaboration system" included: [REDACTED].   AR 755.   Based on these requirements and underlying security concerns, a "Private Cloud" was selected as the "deployment model," and based on [REDACTED]'s June 29, 2010 assessment, [REDACTED].   AR 756.[18]

In addition, on July 15, 2010, Mr. Mazer requested that Assistant Secretary Suh approve and sign attached "Determinations and Findings" to establish Microsoft Desktop and Service Software as the "Department-wide standard for computer operating, systems desktop and service, office automation, and systems management software."   AR 757.   This request was based on an [REDACTED].   AR 762.   The Microsoft products that were standardized included: the Microsoft Windows desktop operating system; Microsoft Office desktop productivity suite;

---

[17] Again, the copy of this document provided in the Administrative Record has no author and was not signed, but contains a warning legend that "disclosure and receipt of this information is restricted by section 27 of the Office of Federal Procurement Policy Act (41 U.S.C. 423)."   AR 765.

[18] The "Determination and Findings" in which Interior's Assistant Secretary-Policy, Management, and Budget approved "Standardizing" the Microsoft BPOS-Federal, reported that utilizing a "Cloud Computing Model" had a stated three year cost of $[REDACTED]million. AR 753.

Microsoft Windows Server Operating system; and Microsoft Systems Center Configuration Manager.  AR 762.

On July 19, 2010, Mr. Standish, Google-Federal, again contacted Ms. Debra Glass, Division Chief, Acquisition Services Directorate, to confirm "that there have been no developments related to the acquisition strategy [for a messaging solution] and the next step will be an RFP which supports competition.  Further, you said there remains no defined time line for this acquisition and internal deadlines have passed which would have been necessary for any award occurring in FY2010."  AR 1017.  Ms. Glass responded that it would be impossible to complete this procurement in FY2010, and that "the next step would be a solicitation[.]"  AR 1016.

On July 22, 2010, Google publically announced the "availability of a government-only version of the Google Apps service."  AR 783 (citing http://www.google.com/apps/intl/en/ government/trust.html) (last visited 1/2/2011).  On that date, Google also announced that the government-only version of the Google Apps Service received FISMA certification, satisfying the "criteria defined by NIST Special Publication 800-53 release 3."  AR 784 (citing http://csrc.nist.gov/publications/nistpubs/800-53-Rev3/sp800-53-rev3-final_updated-errata_05-01-2010.pdf) (last visited 1/2/2011).

On July 26, 2010, Mr. Standish, Google-Federal, sent an email to Deputy Assistant Secretary Jackson, to inform him of these events and request confirmation that Interior had not selected any particular email messaging solution.  AR 1014.  In addition, Mr. Standish asked about rumors that Interior already had a 1,000 user pilot project in place.  AR 1014.  He posited that, if those rumors were true, perhaps this was not a competitive procurement.  AR 1014-15.  On August 2, 2010, Mr. Standish also sent a separate notice to Interior's CTO, Mr. Corrington, to advise him about the recent development of Google Apps for Government and Google's receipt of FISMA certification.  AR 108.

In response to Mr. Standish's July 26, 2010 inquiry, on August 3, 2010, Deputy Assistant Secretary Jackson advised him to direct any further correspondence and telephone calls to Ms. Glass at the National Business Center.  AR 1005.  In response, on August 3 and 11, 2010,[19] Mr. Standish wrote letters to Deputy Assistant Secretary Jackson, copied to Ms. Glass, seeking to reconcile Interior's continued assurances of "fair and open competition" with evidence that Interior had conducted a user program, migrating 5,000 of Interior's 80,000 users to the Microsoft Platform "behind-the-scenes while we were being provided with repeated assurances of full and open competition."  AR 1004-5.[20]  Mr. Standish's August 11, 2010 letter further

---

[19] The Administrative Record does not include the attachment to the August 11, 2010 letter.

[20] This referenced "user program" was the modification of the Enterprise License Agreement with Dell, also known as the May 4, 2010 Unified Messaging System-Project Plan that was "the initial part of the multi-pronged approach [that] will be used to acquire Microsoft products and services to complete this project."  AR 1587; *see also* AR 855 (June 14, 2010 Amendment Modification 0003 to Contract No. GS35F4072D/NBCF09382 with Dell).

observed that Interior's "apparent migration of a significant number of the [Interior] users to the Microsoft platform, associated investment in infrastructure, technology, and program management cannot mean anything other than that [Interior] has pre-selected the Microsoft Exchange messaging solution for department-wide use." AR 1004. Therefore, Google requested that "[Interior] immediately award and undertake a similar pilot for Google Apps to fully evaluate and compare the technologies." AR 1004.

On August 19, 2010, Interior's CIO Mr. Mazer, requested a Limited Source Justification "to limit competition for messaging and collaboration solutions to resellers of the Microsoft Business Productivity Online Suite-Federal (BPOS–Federal). . . . Two features that this product provides on which this limited source justification relies and which are critical to the successful implementation of a transition from a disparate and disjointed email messaging system to a consolidated and secure [sic] are: 1) A unified and consolidated email system and 2) enhanced security." AR 844. The basis for this justification was cited as FAR 8.405-6(a)(2) "for the acquisition of an item peculiar to one manufacturer." AR 847. The request for a Limited Source Justification was approved by the Megan Olsen, Competition Advocate Acquisition Services Directorate, as meeting the requirements of FAR 8.405-6, and was certified and signed by: the Contracting Officer, Nancy L. Moreno; the CTO, Mr. Corrington; and the CIO, Mr. Mazer; and was signed and approved by: Ms. Deborah Sonderman, the Director, Office of Acquisition and Property Management in the Office of the Secretary; and Mr. John Nyce, the Associate Director, Acquisition Services Directorate, National Business Center. AR 850-51.

On August 20, 2010, Mr. Corrington informed Deputy Assistant Secretary Jackson and Ms. Glass about Google's July 22, 2010 announcements regarding Google Apps for Government and FISMA certification. AR 783. Mr. Corrington stated that since Google Apps for Government service "is in direct competition with Microsoft BPOS-Federal[,] . . . it is appropriate to assess the possible impact of these announcements on the BPOS-Federal standardization decision as they relate to this fundamental component of the standardization decision." AR 783. Mr. Corrington, however, recommended no change be made to the two July 15, 2010 Standardization "Decision and Findings":

> While [Google's] announcements represent important milestones in the evolution of cloud computing and its potential for adoption within the Federal Government, it is my professional opinion that they do not warrant a change in the standardization decisions that was made on July 15, 2010.

AR 784. Instead, Mr. Corrington suggested that both July 15, 2010 Standardization "Decision and Findings" be re-evaluated in the second quarter of FY2013. AR 783-85.

On August 30, 2010, Interior issued RFQ No. 503786 on GSA eBuy for "DOI Messaging Solution" to "selected vendors." AR 786.[21] The RFQ description was "to solicit GSA quotes for

---

[21] The Administrative Record, however, does not evidence that RFQ No. 503786 was posted on the GSA eBuy on August 30, 2010 and for how long thereafter. AR 786. The GSA eBuy Notice in the Administrative Record was accessed and printed by the Government on October 29, 2010. AR 786. Likewise, there is no documentation in the Administrative Record

the purpose of entering into a single award, blanket purchase agreement. . . . [T]his Acquisition [will use] subpart 8.4 under the Federal Acquisition Regulation." AR 786. Any questions were to be submitted by 12 p.m. EDT September 3, 2010. AR 787. Quotes were due on September 10, 2010 at 4:30 p.m. EDT, except for Past Performance information that was due on September 7, 2010 by 4:30 p.m. EDT. AR 788.

On September 8, 2010, Google was informed by the Chief of the National Business Center Acquisition Services Directorate that RFQ No. 503786 was issued on GSA's e-Buy and offers were due within a few days. Am. Compl. ¶ 25.

## II.    PROCEDURAL HISTORY.

### A.    At The Government Accountability Office.

On September 10, 2010, Google filed a bid protest at the Government Accountability Office ("GAO") regarding RFQ No. 503786. Compl. ¶ 45. On September 30, 2010, the Government requested Google's protest be dismissed, because Google did not have a GSA Schedule contract, and therefore was not an "interested party." Compl. ¶ 46. On October 4, 2010, Onix filed a protest in support of Google. Compl. ¶ 46. On October 25, 2010, the GAO dismissed Google's protest, because Google was not an "interested party." Compl. ¶ 47. On October 26, 2010, the GAO also dismissed Onix's protest. Compl. ¶ 47.

### B.    At The United States Court Of Federal Claims.

On October 29, 2010, Google filed a Complaint in the United States Court of Federal Claims alleging that Interior's August 30, 2010 Limited Source Justification, authorizing the exclusive procurement of Microsoft's BPOS–Federal Messaging Solution, and the August 30, 2010 RFQ No. 503786 violated: the Competition in Contracting Act, 41 U.S.C. § 253(a); Federal Acquisition Regulation 8.405-6, 48 C.F.R. § 8.405-6; and the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Compl. ¶¶ 48-52. In addition, Google filed motions requesting a Temporary Restraining Order and Preliminary Injunction.

---

to establish that the attachments referenced in RFQ No. 503786 were posted on GSA eBuy on August 30, 2010 and for how long thereafter, *i.e.*, Instructions to Offerors (AR 787-794); the Statement of Work, dated August 2010 (AR 795-837) containing a "For Official Use" label; the Past Performance Questionnaire (AR 838-40); Vendor Response Spreadsheet (AR 841-43); and August 30, 2010 Limited Source Justification. In fact, it appears that the aforementioned attachments initially could not be opened (AR 853). In addition, RFQ No. 503786 Modification 1 indicates that the Limited Source Justification, in fact, was not posted in its entirety on August 30, 2010 (AR 852) (printed on 10/29/10). Perhaps, for that reason, it appears that on September 3, 2010, the closing date for RFQ No. 503786 was extended from September 10, 2010 to September 13, 2010 at 3:00 p.m. EDT. AR 786, 854. Again, there is no evidence in the Administrative Record to confirm that this extension was posted on GSA eBuy and for how long. In addition, there is no evidence in the Administrative Record that indicates who had access to the RFQ and attachments, although it appears this information was made available only to "Selected Vendors" of Microsoft products. AR 786.

On October 29, 2010, the court convened a telephone conference, wherein counsel for the Government represented that Interior would stay proceeding with RFQ No. 503786 until January 25, 2011.  The Government, however, conditioned Interior's stay on the court's agreement to issue a decision on or before January 25, 2011.  The court declined to guarantee any decision by that date, because the Government had not filed the Administrative Record and Google had not filed a Motion For Judgment On The Administrative Record.

On November 1, 2010, the Government informed the court that, in light of the court's failure to guarantee Interior a date certain for a decision, Interior planned to award a Contract under RFQ No. 503786 on, but not before, November 7, 2010.  Based on this representation, Google requested that the court issue a Temporary Restraining Order before that date.  The court indicated that it was inclined to issue a Temporary Restraining Order, and requested a copy of RFQ No. 503786 and the August 30, 2010 "Limited Source Justification."  On November 2, 2010, the Government filed a Notice, forwarding these documents, and representing that the Government intended to file the Administrative Record "on or about" November 5, 2010, but cautioned the court to "not draw any inferences based [on] these two documents in isolation," in considering Google's October 29, 2010 Motion for a Temporary Restraining Order.  11/2/10 Gov't Notice at 1.

On November 4, 2010, the Government informed the court that, on further consideration, Interior decided not to award Contract under RFQ No. 503786 until January 25, 2011.  On November 5, 2010, the court entered a Protective Order.  On November 8, 2010, the Government filed the Administrative Record ("AR 1-1090") under seal.

On November 15, 2010, Softchoice Corporation ("Softchoice") filed an unopposed Motion to Intervene as a Defendant-Intervenor, that the court granted on the same date.  On November 19, 2010, the Government filed an Opposition to Google's October 29, 2010 Motions For A Temporary Restraining Order And For Preliminary Injunction, under seal.  In addition, on that date, Defendant-Intervenor Softchoice filed a Motion To Dismiss, pursuant to RCFC 12(b)(1), together with a Response to Google's October 29, 2010 Motion For Preliminary Injunction, under seal.

On November 23, 2010, the Government filed a Motion To Amend/Correct The Administrative Record, by adding documents attached in TAB 31(a) (AR 1003.1-1003.9) and TABS 33-46 ("AR 1091-1575").   On November 29, 2010, the court granted the Government's November 23, 2010 Motion.

On December 3, 2010, Google filed under seal: a Motion For Judgment On The Administrative Record;[22] Reply to the Government and Softchoice's November 19, 2010 Opposition to Google's October 29, 2010 Motion For A Preliminary Injunction; and Response to Softchoice's November 19, 2010 Motion To Dismiss.

---

[22] Attached to Google's Motion is an Exhibit A.  This document is not included in the Administrative Record and has not been considered by the court.

On December 17, 2010, Softchoice filed under seal a Reply to Google's December 3, 2010 Response and a Cross Motion and Response to Google's December 3, 2010 Motion For Judgment On The Administrative Record, under seal, together with four attachments.[23]   On that same date, the Government filed a Cross Motion and Response to Google's December 3, 2010 Motion For Judgment On The Administrative Record, under seal.[24]   In addition, the Government filed a Second Motion To Amend/Correct The Administrative Record to include the document attached at TAB 47 ("AR 1576-1616").  On December 21, 2010, the court issued an Order granting the Government's Second Motion To Amend/Correct.  On December 30, 2010, Google filed an expanded Amended Complaint to protest the entire procurement.  On December 31, 2010, Google filed a Response and Reply to the Government and Softchoice's December 17, 2010 Cross Motions For Judgment On The Administrative Record.

## III.   DISCUSSION.

### A.        Jurisdiction.

The United States Court of Federal Claims has jurisdiction, pursuant to 28 U.S.C. § 1491(b)(1):

> to render judgment on an action by an interested party objecting to a solicitation by a federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or proposed procurement.

*Id.*; *see also Magnum Opus Technologies, Inc.* v. *United States*, 94 Fed. Cl. 512, 527 (2010) (summarizing the three categories of "bid protest" jurisdiction authorized by 28 U.S.C. § 1491(b)(1)).

The United States Court of Appeals for the Federal Circuit considered the phrase "in connection with a proposed procurement," as used in 28 U.S.C. § 1491(b)(1), in *Distributed Solutions, Inc.* v. *United States*, 539 F.3d 1340, 1345-46 (Fed. Cir. 2008).  Therein, our appellate court held that the phrase "procurement or proposed procurement" is defined to include "*all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout.*" *Id*. at 1345 (quoting 41 U.S.C. § 403(2) (emphasis added)).  Specifically, "in connection with a proposed procurement," by definition, "involves a connection with any stage of the federal contracting acquisition process, including the process for determining a need for property or services."  *Id*. at 1346 (internal quotation marks and citations omitted).

---

[23] These documents were not included in the Administrative Record and have not been considered by the court.

[24] Attached to the Government's Cross Motion and Response are Attachments 1-4.  These documents are not included in the Administrative Record and have not been considered by the court.

The gravamen of the October 29, 2010 Complaint and December 30, 2010 Amended Complaint is that the process by which Interior restricted competition exclusively to the Microsoft BPOS–Federal and the Microsoft Desktop and Service Software for messaging and collaboration solutions violated the Competition in Contracting Act, 41 U.S.C. § 253(a) and the FAR, and therefore was arbitrary, capricious, an abuse of discretion and contrary to law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Since the collective claims alleged in the October 29, 2010 Complaint and the December 30, 2010 Amended Complaint allege violations of statutes and regulations in connection with a proposed procurement, the court has jurisdiction to adjudicate those claims.

**B.      Standing.**

**1.      Google, Inc. And Onix Networking Corporation Have Standing.**

As a threshold matter, a plaintiff contesting the award of a federal contract must establish that it is an "interested party" to have standing under 28 U.S.C. § 1491(b)(1). *See Myers Investigative & Sec. Servs.* v. *United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) ("[S]tanding is a threshold jurisdictional issue[.]"). The United States Court of Appeals for the Federal Circuit has construed the term "interested party" in 28 U.S.C. § 1491(b)(1) to be synonymous with "interested party" as defined by the Competition in Contracting Act ("CICA"), 31 U.S.C. § 3551(2)(A). *See Rex Serv. Corp.* v. *United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (citing decisions adopting the CICA definition of "interested party" for 28 U.S.C. § 1491(b)(1) purposes). Therefore to establish standing as an "interested party": "a protestor must show that: (1) it was an actual or prospective bidder or offeror, and (2) it had a direct economic interest in the procurement or proposed procurement." *Distrib. Solutions*, 539 F.3d at 1344.

Where a claim is made that an agency violated the CICA by failing to comply with the procedures set forth, "it is sufficient for standing purposes if the plaintiff shows that it likely would have competed for the contract had the government publicly invited bids or requested proposals." *CCL, Inc.* v. *United States*, 39 Fed. Cl. 780, 790 (1997); *see also id.* at 789 ("The standing question cannot be divorced entirely from the precise nature of the challenge brought and hence from the jurisdictional waiver."); *see also Global Computer Enterprises, Inc.* v. *United States*, 88 Fed. Cl. 350, 418-19 (2009) (holding that, under the Tucker Act, a plaintiff was an interested party where it would have submitted an offer if a competitive solicitation had issued).

The Administrative Record in this case is replete with evidence that Google, Inc. was engaged in an active campaign to be afforded the opportunity to have the Google Apps Service considered for procurement, if and when Interior issued a RFP. *See, e.g.*, AR 59, 97, 101, 150, 184-85, 783-84, 1014-15, 1017, 1023, 1029-30, 1034-36. Since Google, Inc. would receive substantial revenue from any such procurement, Google has established that it had a direct economic benefit in this "procurement." *See Distrib. Solutions*, 539 F.3d at 1345 ("The contractors also possess a direct economic interest in the government action at issue in that they were . . . deprived of the opportunity to compete for the provision of [the services]."). In addition, since Onix is a licensed vendor of Google products and services, if Google, Inc.

products and services were selected for consideration, Onix would have a direct economic interest at stake.

In addition, a protestor must show that the alleged errors in the procurement were prejudicial. *See Labatt Food Serv., Inc* v. *United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009) ("It is basic that because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits.") (quotations and citations omitted); *see also Myers*, 275 F.3d at 1370 ("[P]rejudice (or injury) is a necessary element of standing."). A party satisfies this requirement, if "it can show that[,] but for the error, it would have had a substantial chance of securing the contract." *Labatt*, 577 F.3d at 1378. Importantly, the standing inquiry must not conflate the requirements of "direct economic interest" and prejudicial error. *Id.* at 1380 (explaining that examining economic interest, but excluding prejudicial error from the standing inquiry "would create a rule that, to an unsuccessful but economically interested offeror in a bid protest, any error is harmful").

As for the issue of prejudice, the United States Court of Federal Claims has recognized that "deprivation of an opportunity to compete is sufficient economic harm to demonstrate prejudice for purposes of standing." *Magnum Opus* v. *United States*, 94 Fed. Cl. 512, 533 (2010). As evident from the Administrative Record, Google, Inc. has been deprived of the opportunity to compete. *See Weeks Marine, Inc.* v. *United States*, 575 F.3d 1352, 1363 (Fed. Cir. 2009) ("[W]e conclude that in a pre-award protest such as the one before us, [a] prospective bidder or offeror must establish 'a non-trivial competitive injury which can be addressed by judicial relief' to meet the standing requirement of § 1491(b)(1)."); *see also Rex Service Corporation* v. *United States*, 448 F.3d 1305, 1308 n.1 (2006) (indicating that protester may have standing, if "improper agency action" prevents the offeror from submitting a bid or protesting the solicitation).

Since the October 29, 2010 Complaint and the December 30, 2010 Amended Complaint challenge the entire procurement process concerning Interior's email messaging system, the fact that neither individual plaintiff submitted a bid in response to the RFQ No. 503786, which was only the last step in this procurement, is not dispositive of the standing of either.

## 2.   Softchoice Corporation Does Not Have Standing.

The United States Court of Appeals for the Federal Circuit requires that the trial judge evaluate three factors in determining whether intervention is timely: "(1) the length of time during which the would-be intervenors actually knew or reasonably should have known of [their] right[s;] (2) whether the prejudice to the rights of existing parties by allowing intervention outweighs the prejudice to the would-be intervenors by denying intervention[;] (3) existence of unusual circumstances militating either for or against a determination that the application is timely." *Belton Indus., Inc.* v. *United States*, 6 F.3d 756, 762 (Fed. Cir. 1993) (citations omitted;

certain alterations in original); *see also* RCFC 24(a)(2).[25]   In addition, our appellate court has advised that "the requirements for intervention are to be construed in favor of intervention." *Am. Mar. Transp., Inc.* v. *United States,* 870 F.2d 1559, 1561 (Fed. Cir. 1989).

On November 15, 2010, Softchoice Corporation ("Softchoice") filed an unopposed Motion To Intervene, wherein Softchoice stated that it is a "technology solutions and services company that manages the technology needs of more than 15,000 corporate and public sector organizations across the United States and Canada."  Mot. to Int. at 2.  In addition, Softchoice represented that it is a GSA Schedule 70 contractor and an authorized reseller of Microsoft products, including BPOS-Federal.  *Id.*  Softchoice further asserted that it "submitted a timely quotation to [Interior] in response to the RFQ."  *Id.*  The Administrative Record, however, does not include any verification of Softchoice's GSA Schedule 70 status or Softchoice's "timely quotation" nor did Softchoice independently proffer either in support of its November 15, 2010 Motion.

Since neither Google nor the Government objected to Softchoice's intervention, on November 15, 2010, the court granted Softchoice status as an intervenor, pursuant to RCFC 24(a)(2).  After reviewing the Administrative Record, however, the court has determined that there is no documentation therein, or otherwise, that supports the requirement of RCFC 24(a)(2) that Softchoice be "so situated that the disposition of [this] action may as a practical matter impair or impede the movant's ability to protest its interest[.]"  RCFC 24(a)(2).  Accordingly, on reconsideration, the court denies Softchoice's November 15, 2010 Motion To Intervene, without prejudice to refile with appropriate documentation in any subsequent and related proceeding arising from this Memorandum Opinion and Order.[26]

### C.      Standard Of Review On A Motion Upon The Administrative Record.

Pursuant to the Tucker Act, as amended by the Administrative Dispute Resolution Act, Pub. L. No. 104-320 § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996), the United States Court of

---

[25] Rule 24(a)(2) of the United States Court of Federal Claims provides, in relevant part, that:

> On timely motion, the court must permit anyone to intervene who . . . claims an *interest relating to the property or transaction that is the subject of the action*, and is so situated that the *disposition of the action may* as a practical matter *impair or impede the movant's ability to protect its interest*, unless existing parties adequately represent that interest.

RCFC 24(a)(2) (emphasis added).

[26] Likewise, Softchoice's subsequent filings, *i.e.*, the November 19, 2010 Motion to Dismiss, November 19, 2010 Opposition to Plaintiff's Motion for a Preliminary Injunction, and Softchoice's December 17, 2010 Opposition to Plaintiff's Motion For Judgment On The Administrative Record and Cross Motion For Judgment On The Administrative Record are dismissed, without prejudice, subject to the aforementioned conditions.

Federal Claims reviews challenges to agency decisions pursuant to the standards set forth in the Administrative Procedure Act ("APA").  28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see also* 5 U.S.C. § 706(2)(A) ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"); *Banknote Corp. of Am., Inc*. v. *United States,* 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A)[.]" (citations omitted).

In the court's view, some of our appellate court's cases have discussed the substantive hierarchy of the Administrative Procedure Act standards in a manner that can lead the trial court to conduct an improper analysis.  *See e.g., Weeks Marine, Inc.* v. *United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009) (holding that the award of a contract may be set aside if: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.") (citations omitted); *see also Galen Med. Assocs. Inc.* v. *United States,* 369 F.3d 1324, 1329 (Fed. Cir. 2004) ("a bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.") (internal quotation marks and citations omitted).  As the United States Court of Appeals for the Federal Circuit has held in other cases, the court's primary responsibility is to determine whether the agency violated a federal statute or regulation in the procurement process and whether any such violation was prejudicial.  *See Axiom Res. Mgmt.* v. *United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (holding that "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations.") (internal quotation marks and citations omitted); *see also Banknote Corp.*, 365 F.3d at 1351 (Fed. Cir. 2004) (when challenging a government contract procurement due to a violation of law or procedure, "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations") (citations omitted).  If no prejudicial violation of law or regulation is found, the court next is required to determine whether the agency decision evidences a rational basis.  *See Emery Worldwide Airlines, Inc.* v. *United States*, 264 F.3d 1071, 1086 (Fed Cir. 2001) (to meet the burden of showing that a sole-source award lacks rational basis, a party can show: "(1) the agency's decision to conduct a sole-source procurement process lack a rational basis; (2) the agency's sole-source requirements lacked a rational basis; *or* (3) based on the sole-source requirements, the selection of the sole-source awardee lacked a rational basis.") (emphasis added).  Last, the court is required to ascertain whether the agency *otherwise* acted in an arbitrary and capricious manner with respect to the procurement at issue.  *See Banknote Corp.,* 365 F.3d at 1350 ("a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion.'").

A motion for judgment on the administrative record, pursuant to RCFC 52.1, is akin to an expedited trial on the record and has no counterpart in the Federal Rules of Civil Procedure.  *See* RCFC 52.1, Rules Committee Note (July 13, 2009); *see also Bannum, Inc.* v. *United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) ("[T]he judgment on an administrative record is properly understood as intending to provide for an expedited trial on the record.").  Accordingly, on a motion for judgment on the administrative record, the court is required to determine whether the plaintiff has met the burden of proof to show that the relevant federal agency decision lacked a

rational basis or was not in accordance with the law. *Id*. at 1357 (instructing the trial court to make "factual findings under RCFC [52.1] from the [limited] record evidence as if it were conducting a trial on the record"). The existence of a material issue of fact, however, does not prohibit the court from granting a motion for judgment on the administrative record, nor is the court required to conduct an evidentiary proceeding. *See Bannum, Inc.*, 404 F.3d at 1353-54 ("RCFC [52.1] requires the [United States] Court of Federal Claims, when making a prejudice analysis in the first instance, to make factual findings from the record evidence as if it were conducting a trial on the record.").

> ### D. The Administrative Record In This Case Supports Issuing A Preliminary Injunction At This Juncture.

On July 15, 2010, the Assistant Secretary-Policy, Management, and Budget signed a "Determination and Findings," establishing Microsoft's Business Productivity Online Suite-Federal as "the Department-wide standard for Messaging and Collaboration." AR 748-56. On that same date, the Assistant Secretary-Policy, Management, and Budget also signed a separate "Determination and Findings," establishing Microsoft Desktop and Service Software as the "Department-wide standard for computer operating, system desktop and service, office automation, and systems management software." AR 757-62.

Both July 15, 2010 Standardization "Determination and Findings" are quintessential "non-competitive procedure[s]," that must be justified by the "contracting officer." 41 U.S.C. § 253(f)(1)(A). In addition, since these Standardization "Determinations and Findings" concern an amount exceeding $50 million (AR 753), they require the additional approval of "the senior procurement executive of the agency." 41 U.S.C. § 253(f)(1)(B)(iii) (emphasis added).

The Assistant Secretary–Policy, Management, and Budget, however, is neither the "Contracting Officer," nor appears to be the Department of Interior's "senior procurement executive." In fact, the establishment of a "Department-wide standard for messaging and collaboration" and a "Department-wide standard for Office Automation and Systems Management Software" does not appear to fall within the responsibilities of the Assistant Secretary–Policy, Management, and Budget.[27] On Interior's website, the job description of the

---

[27] Interior's Manual describes the responsibilities of the Assistant Secretary–Policy, Management and Budget as follows:

> B.   Assistant Secretary - Policy, Management and Budget (PMB).  The Assistant Secretary–Policy, Management and Budget exercises the Secretary's authority to implement Departmental policy for organizational and human resources management.

> (1)   The responsibilities of the Assistant Secretary–Policy, Management and Budget include:

> (a)   Developing and implementing Departmental policy for organization management for headquarters and field offices.

Case 1:10-cv-00743-SGB   Document 48   Filed 01/04/11   Page 22 of 27

Assistant Secretary–Policy, Management, and Budget is to "oversee[] programmatic, administrative and financial policy for the Department, including budget formulation and implementation."  Department of Interior, Office of Policy, Management and Budget Website, http://www.doi.gov/pmb/about.html (last visited 1/3/2011).

---

         (b)      Implementing a Departmental program for organizational reviews.

         (c)      Reviewing and approving, or recommending modifications to proposed headquarters and field office organizational changes and field office locations.

         (d)      Reviewing and analyzing the effects of legislative proposals on the Department's organizational management policies.

         (e)      Reviewing and making recommendations to the Inspector General on proposed organizational changes, and publishing those changes in the Departmental Manual.

         (2)      The Assistant Secretary–Policy, Management and Budget receives staff assistance on organizational management and human resources policy from the Office of Planning and Performance Management and the Office of Personnel Policy, respectively.

http://elips.doi.gov/app_dm/act_getfiles.cfm?relnum=3380 (last visited 12/27/2010).

In addition, the General Organizational Chart for the U.S. Department of the Interior shows that the CIO reports directly to the Secretary of the Department of the Interior, *not* the Assistant Secretary–Policy, Management, and Budget.   Instead, the CIO only "receives administrative guidance and support from the Assistant Secretary-Policy, Management, and Budget."



http://elips.doi.gov/elips/release/images/DM3170CT.htm (last visited 12/27/2010).

Both of the July 15, 2010 Standardization "Determination and Findings," however, originated from the CIO, but were directed to the Assistant Secretary-Policy, Management, and Budget for approval, circumventing line authority to the Secretary of the Department of the Interior or the Secretary's Deputy,[28] and reversing the roles of the Assistant Secretary-Policy, Management, and Budget and the CIO.

In addition, both of the July 15, 2010 Standardization "Determination and Findings" failed to comply with the requirements of FAR 6.302-1(a), 6.303-1, 6.303-2, and 6.304.   Since both the July 15, 2010 Standardization "Determination and Findings" are based on a decision

---

[28] Of particular note, is the fact that the May 4, 2010 "Unified Messaging System—Project Plan," issued by the same CIO, identifies the need for a "Secretarial Order endorsing the [P]roject." AR 1587.   The Administrative Record does not include <u>any</u> such Order.

that "only one responsible source . . . and no other supplies or services will satisfy [Interior's] requirements" (48 C.F.R. § 6.302-1), the contracting officer is prohibited from "commenc[ing] negotiations for a sole source contract . . . unless the contracting officer": (1) provides a justification per FAR 6.302, the contents of which are specified at FAR 6.303-2; (2) certifies the "accuracy and completeness of the justification"; and (3) "obtains the approval required by [FAR] 6.304." 48 C.F.R. § 6.303-1(a). As the Administrative Record evidences, negotiations for a sole source contract with Microsoft "commenced" many months prior to July 15, 2010. *See, e.g.,* AR 1039-89 *see also* AR 1041 (April 8, 2010 Microsoft email to Deputy Assistant Secretary Jackson regarding "Call follow up deliverables.")

In addition, neither Standardization "Determination and Findings" is accompanied by a proper justification or appropriate approvals. To the extent the Standardization "Determination and Findings" were intended to substitute for a justification, several deficiencies are apparent. First, neither document identifies the "*statutory authority* permitting other than full and open competition." FAR 6.303-2(a)(4) (emphasis added).

Second, the "anticipated cost" discussion (AR 753-54) contains no estimate of internal agency cost, *e.g.,* Project Management Office and Independent Verification and Validation costs that apparently will be the subject of a "separate procurement." AR 767. More importantly, there is no consideration or discussion about the more significant embedded costs associated with what [REDACTED] described in a March 16, 2010 report as the cost of "organizational lock-in . . . making alternative [products] difficult to use." AR 647. In the context of describing "organizational lock-in" regarding Microsoft Office products, [REDACTED] specifically stated that: [REDACTED]. AR 651; *see also* AR 677 ([REDACTED]); AR 252 ([REDACTED]). Nevertheless, on July 15, 2010, Interior preceded to standardize on the Microsoft Office desktop productivity suite. AR 762. Google described the effect of "organizational lock-in" in more pragmatic terms: Interior's decision to standardize the Microsoft Exchange Messaging Solution "provides [Microsoft] technology [with] a significant prejudicial, if not insurmountable, advantage in any future competition." *Compare* AR 1004 *with e.g.,* AR 1586 (Interior reporting that "other components of the BPOS-Federal suite will be made available to [Interior] bureaus and offices on an optional basis"). The value of organizational lock-in certainly was not lost on Microsoft. AR 1087 ([REDACTED]) (emphasis added); AR 1040-41 (describing Microsoft as the largest provider of BES services in the world, and 90% of Exchange Online Dedicated customers uses BlackBerry service[.] [REDACTED]). Without considering embedded costs, including the cost of organizational lock-in, it is not surprising that the July 15, 2010 Standardization "Determination and Findings" fails to include the required statement that "anticipated cost to the Government would be fair and reasonable." FAR 6.303-2(a)(7).

Third, there is no "listing of sources . . . that expressed in writing an interest in the [procurement]." FAR 6.303-2(a)(10). The failure to list Google's repeated express interest in this procurement cannot be explained as an oversight.

Fourth, there is no statement of the actions that Interior plans "to remove or overcome [a] barrier to competition before any subsequent acquisition for the supplies or services required." FAR 6.303-2(a)(11).

By July 22, 2010, however, Interior was aware that Google had a government-only version of the Google Apps product and claimed it had obtained FISMA certification.  AR 783-84.  Nevertheless, on August 20, 2010, Interior's CTO, Mr. Corrington, recommended that this information did "not warrant a change in the standardization decision(s) that [were] made on July 15, 2010."  AR 784.  None of this is mentioned in the subsequent August 30, 2010 Limited Source Justification, citing the dual July 15, 2010 Standardization "Determination and Findings" as the predicate agency authority for the "Justification."  AR 848.  Of course, Mr. Corrington suggests a formal re-evaluation in the second quarter of FY2013.  AR 785.  By that time, however, the migration of Interior's email system will be completed and "organizational lock-in" achieved.  AR 1584; AR 1616.

On a motion for preliminary injunctive relief, the court must weigh four factors: "(1) immediate and irreparable injury to the movant; (2) the movant's likelihood of success on the merits; (3) the public interest; and (4) the balance of hardship on all the parties."  *U.S. Ass'n of Imp. of Textiles & Apparel* v. *United States,* 413 F.3d 1344, 1346 (Fed. Cir. 2005).  "*No one factor*, taken individually, *is necessarily dispositive*. . . .   [T]he weakness of the showing regarding one factor may be overborne by the strength of others."  *FMC Corp.* v. *United States*, 3 F.3d 424, 427 (Fed. Cir. 1993) (emphasis added).

As to the first factor, the court has been informed that Interior intends to award a contract, pursuant to RFQ No. 503786 on January 25, 2011.  As discussed herein, the July 15, 2010 Standardization "Determination and Findings," on which the August 30, 2010 Limited Source Justification was based, violate the Competition in Contracting Act and FAR.  Without a preliminary injunction, the award will put into motion the final migration of Interior's email system, achieve "organizational lock-in" for Microsoft, and cost Google the opportunity to compete.  Therefore, without injunctive relief, Google will suffer immediate and irreparable harm.  *See PGBA, LLC* v. *United States*, 57 Fed. Cl. 655, 664 (2003) ("This court has acknowledged that a lost opportunity to compete may constitute an irreparable harm[.]").  Therefore, the first factor weighs in favor of an injunction.

The second factor concerns the likelihood of success on the merits.  Based on the allegations set forth in the October 29, 2010 Complaint, as amended on December 30, 2010, the court's review of the Administrative Record has established that Google has made a *prima facie* showing that Interior violated the Competition in Contracting Act and relevant FAR provisions and that such violation was prejudicial to Google's interests.  Therefore, Google has met the second test, *i.e.*, a likelihood of success on the merits for a preliminary injunction.  *See Savantage Fin. Servs., Inc.* v. *United States*, 81 Fed. Cl. 300, 306-08 (2008) (holding that the Department of Homeland Security's decision to use financial management software systems of two incumbent contractors by means of a brand name justification to standardize the agency's financial software systems was an improper sole source procurement that violated the CICA, where there were other responsible sources).

As to the third factor, the court has determined that the public interest is served by the issuance of a preliminary injunction to ensure Interior's compliance with the requirements set forth in the Competition in Contracting Act and the FAR.  *See PGBA*, 57 Fed. Cl. at 663 ("Clearly, the public interest in honest, open, and fair competition in the procurement process is

compromised whenever an agency abuses its discretion in evaluating a contractor's bid."). In addition, the Administrative Record in this case is far from complete. Apart from specific items noted herein, this procurement concerns more than "RFQ No. 503786." As the United States Court of Appeals for the Federal Circuit has held the scope of the "procurement or proposed procurement" includes "*all stages* of the process in acquiring property or services, *beginning with the process* for determining a need for property or services and ending with contract completion and close out." *Distributed Solutions*, 539 F.3d at 1345 (emphasis added).[29] As such, the Administrative Record should include all relevant documents from late 2007 to date, including those relating to the 2009 BPOS-Federal Pilot Program, the July 15, 2010 Standardization "Determination and Findings," the August 30, 2010 Limited Source Justification, as well as the August 30, 2010 RFQ No. 503786. The email communications between Interior and Microsoft establish that the Administrative Record is not complete. The most striking example is the September 24, 2009 email from Interior's CTO, Bill Corrington, to Microsoft's Vice President, Federal Government, Ms. Theresa Carlson, and other Microsoft representations, wherein Mr. Corrington expressed a "demonstrated . . . commitment to the success of the project by both DOI and Microsoft. I look forward to . . . continuing to work with the Microsoft team to *achieve a successful project outcome*." AR 1088 (emphasis added). The only document that precedes this is a July 31, 2009 email referencing a meeting between Microsoft's Ms. Justina Glavin, Deputy Assistant Secretary Jackson, and Mr. Corrington. AR 1088. It is inconceivable that Interior decided to commit to "Microsoft's team to achieve a successful project outcome" within 30 days without other internal documents being generated. In addition, the Administrative Record contains none of the attachments to emails between Interior and Microsoft. *See e.g.* AR 1035-37, 1041, 1052, 1055, 1064, 1067, 1068, 1073, 1077, 1088. Moreover, the court finds it unusual that the Deputy Assistant Secretary Jackson had "regular monthly one-on-one" meetings with Ms. Carlson, but apparently took no notes or didn't maintain them. AR 1039. As the Rules of the United States Court of Federal Claims provide: "a protest case cannot be efficiently processed until production of the administrative record" is provided. RCFC App. C ¶ 23. For this additional reason, the court has determined that the public interest is served by a preliminary injunction in this case.

With respect to the fourth factor, Interior has been engaged in a process to ascertain the requirements of a new email, calendaring, and collaboration system at least since 2007. *See, e.g.*, AR 1-2, 97, 150, 154-68, 175, 184, 748-56, 762, 765-72, 844-51, 855, 1584. As of July 19, 2010, Ms. Debra Glass, Division Chief, Acquisition Services Directorate, National Business Center advised Google that it would be impossible to complete this procurement in fiscal year 2010. AR 1016. Under these circumstances, any *de minimis* inconvenience to Interior caused by the court's Preliminary Injunction is outweighed by the above referenced public interest and the secondary competitive harm to the Google. During this period, the Secretary of the Department of the Interior will have an opportunity to correct the deficiencies herein cited, with the advice of

---

[29] For example, the Administrative Record does not include a copy of the contracting officer's determination justifying how Contract No. 6535F40720/NBMF09382, initially issued to purchase licenses, can be "modified" to purchase software and equipment, instead of issuing a separate procurement. This "modification" is the vehicle by which the initial migration of Interior's email was to be made to Microsoft. It is not clear whether the procurement under that contract has commenced, is ongoing, or completed.

the Solicitor and the Inspector General.  The Secretary also may wish to seek the independent views of outside experts as to whether reconsideration of the July 15, 2010 Standardization Decisions is warranted in light of the subsequent availability of Google's Apps offering, if for no reason other than continued congressional appropriations will be required to implement the procurement, whether it is delivered by Microsoft, Google, or some other contractor.  *See* General Accountability Office Report to the Committee on Oversight and Government Reform, House of Representatives, "Federal Contracting: Opportunities Exist to Increase Competition And Assess Reasons When Only One Offer Is Received," GAO-10-833 (July 2010); *see also* AR 1531-75 (Inspector General's FY2009 FISMA Evaluation Report).

The court emphasizes that it has made no judgment as to whether Interior's basis for this procurement was rational or whether the procurement was conducted in a manner that was arbitrary and capricious.  The court, however, discerns no basis in the present Administrative Record to support Google's allegations of bad faith, [REDACTED].  Likewise, the court discerns no improper conduct by Microsoft, the actions of which show only competitive zeal and interest in customer satisfaction.

## IV.    CONCLUSION.

For the reasons set forth herein, it is hereby ordered that: the United States of America, the Department of the Interior, and their officers, agents, servants, employees, and representatives are preliminarily enjoined from proceeding with or awarding a contract to implement a Microsoft Business Productivity Online Suite-Federal Messaging solution, pursuant to RFQ No. 503786 or any related procurement, solicitation, task order, or activity, including proceeding with the June 14, 2010 Amendment Modification 0003 to Contract No. GS35F4072D/NBCF09382.  *See* RCFC 65(a).[30]  In addition, this procurement is remanded to Interior "for additional investigation or explanation."  *Florida Power & Light Co.* v. *Lorion*, 470 U.S. 729, 744 (1985).

**IT IS SO ORDERED.**

<u>**s/Susan G. Braden**</u>
**SUSAN G. BRADEN**
**Judge**

---

[30] This Order was issued on January 3, 2011, at 6:00 pm (EST).